Megan E. Jones (SBN 296274)
mjones@hausfeld.com
**HAUSFELD LLP**
580 California Street, Fl 12
San Francisco, CA 94104-1033
Telephone: (415) 744-1951
Facsimile: (415) 358-4980

*Counsel for Plaintiffs*

*(Additional counsel on signature page)*

Helen I. Zeldes (SBN 220051)
*hzeldes@sshhzlaw.com*
Susan G. Taylor (SBN 190753)
*staylor@sshhzlaw.com*
**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES, LLP**
501 West Broadway, Suite 800
San Diego, California 92101
Telephone: (619) 400-4990

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

**JUSTIN LEVIAN, NOEL FLORES, ALBERT MEJIA, NATASHA GAUVIN, ANTONIO ENRIQUEZ, SAMRIDH CHHETRI, SELINA DALLAS, NATHANIEL MARRUFO, AALIYAH ROSS, RAY RODRIGUEZ, CHRISTOPHER TAYLOR**, and **MOHAMMAD SUPIRO**, *individually and on behalf of all others similarly situated*,

*Plaintiffs*,

v.

**META PLATFORMS, INC** and **LUXOTTICA OF AMERICA, INC.**

*Defendants*.

Case No.:

**CLASS ACTION COMPLAINT FOR DAMAGES**

**JURY TRIAL DEMANDED**

Plaintiffs Justin Levian, Noel Flores, Albert Mejia, Natasha Gauvin, Antonio Enriquez, Samridh Chhetri, Selina Dallas, Nathaniel Marrufo, Aaliyah Ross, Ray Rodriguez, Christopher Taylor, and Mohammad Supiro ("Plaintiffs"), individually and on behalf of all others similarly situated, as more fully described below (the "Class" and "Class Members"), bring this class action Complaint against Defendant Meta Platforms, Inc. ("Meta") and Defendant Luxottica of America, Inc. ("Luxottica") (collectively, "Defendants"), and allege the following based upon information and belief, unless otherwise expressly stated as based upon personal knowledge.

## I. INTRODUCTION

1. For over a decade, dominant technology platforms have assured the public that users are "in control" of their privacy—while quietly expanding data collection, weakening default settings in ways that erode data protections, and deploying opaque systems that repurpose private user information for advertising, product development, and machine learning.

2. The trust gap created by this history of broken privacy promises has become emblematic of the modern digital era: Platforms advertise control while making design and use decisions that steer users unknowingly toward broader sharing of their personal data, only disclosing the scope of collection and access after the fact.

3. As generative AI has moved to the center of consumer technology, the underlying incentives for widescale data collection have intensified. Training and improving modern AI systems depends on vast quantities of real-world data, driving platforms to ingest and repurpose ever larger volumes of personal information.

4. Indeed, the spread of generative AI from browsers and phones into the physical world—doorbells, home assistants, cars, and now wearables—has worsened the incentives for companies to indiscriminately harvest data from consumers in the name of continual development and "improvement" of the AI.

5. Technology platforms and providers that once captured just clicks and posts now capture users' and bystanders' images and voices, private household routines, and intimate spaces.

6. And the same marketing playbook persists: privacy and safety are placed at the forefront of campaigns and user control is promised, where no such privacy and no such control in fact exist. The result is a widening chasm between consumer expectations and actual data flows that feed model training.

7. Against this backdrop, Defendants jointly launched, branded, and retailed camera-equipped wearables (the "Meta AI Glasses" or the "Glasses) with a campaign centered on a singular privacy promise: "designed for privacy, controlled by you." But this assurance was a fallacy.

8. Whistleblower accounts from Meta's subcontractors tasked with manually reviewing content captured by the Meta AI Glasses revealed that Defendants were misrepresenting the privacy safeguards promised to consumers. These accounts revealed that Defendants were concealing the fact that highly intimate and personally identifying videos and audio were manually reviewed by human reviewers directly contrary to Defendants' assurances of privacy and anonymization.

9. Luxottica, as Meta's manufacturing, branding, and retail partner and the U.S. distributor operating consumer-facing channels such as Sunglass Hut, participated in, approved, and disseminated these privacy misrepresentations and omissions, and is independently liable, along with Meta, for its role deceiving consumers about the privacy implications of the Meta AI Glasses.

10. These whistleblower reports recount seeing the most private moments of people's lives: individuals changing clothes, using the bathroom, engaging in intimate sexual conduct, handling medical or financial documents, interacting with and caring for children, and performing other activities that no reasonable consumer would consent to or expect strangers to observe. "We see everything — from living rooms to naked bodies. Meta has that type of content in its databases. People can record

themselves in the wrong way and not even know what they are recording," a Meta subcontractor warned.[1] Others reported viewing clips captured by the Meta AI Glasses which included things like bank cards, personal paperwork, or other identifying details inadvertently caught on camera.

11. No reasonable consumer would read statements such as "designed for privacy, controlled by you" or "built for your privacy" to mean that recordings made inside their homes (and their bedrooms and bathrooms) would be viewed, cataloged, and analyzed by human workers overseas. Defendants jointly made privacy the centerpiece of their marketing while concealing facts that flatly contradicted those assurances.

12. By virtue of making these affirmative privacy representations, Defendants owed a duty to disclose material facts necessary to allow consumers to make informed decisions about the product they were purchasing and the privacy implications thereof. Instead, Defendants obscured the invasive nature of the Meta AI Glasses: that enabling their AI features would result in human reviewers halfway around the world viewing the most intimate aspects of users' lives and lives of others around them.

13. And in reliance on this deceptive marketing, adoption surged—with millions of pairs of the Meta AI Glasses reportedly sold in 2025—magnifying the scope of potential exposure for users and bystanders who never meaningfully consented to, nor understood, that their intimate lives might be routed to Meta's subcontractors overseas for manual review.

---

[1] Kim LaCapria, *Watchdog Calls Out Meta Following 'Concerning' Report from Workers About Its Smart Glasses*, The Cool Down (Mar. 6, 2026), https://www.thecooldown.com/green-tech/meta-ai-glasses-privacy-lawsuit-false-advertising/.

14. Plaintiffs and the members of the proposed Classes relied on Defendants' privacy assurances when purchasing the AI smart glasses.

15. This nationwide class action seeks to hold Defendants accountable for their joint misrepresentations to consumers, for misleading advertising, for the safety failings of their product, and for failing to disclose the true scope of surveillance and privacy invasions encapsulated in their Meta AI Glasses. Consumers purchased the Meta AI Glasses in reliance on Meta's and Luxottica's express privacy assurances. No reasonable consumer could have anticipated that enabling the AI features core to Meta AI Glasses would expose their families, bodies, homes, and private documents and activities to human reviewers.

16. Defendants' conduct violates consumers' rights under tort, product liability, and state and federal consumer-protection laws, and undermines fundamental expectations of privacy.

## II. JURISDICTION

17. This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Classes consist of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

18. This Court has personal jurisdiction over Defendants because Defendant Meta is headquartered in this District, and because Defendants purposefully availed themselves of this forum by conducting substantial business within California such that Defendants have significant, continuous, and pervasive contacts with the State of California.

19. Venue is proper in this District under 28 U.S.C. § 1391 because Defendant Meta Platforms Inc. resides in this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

20. Because Meta resides in Menlo Park, San Mateo County, and a significant amount of the events giving rise to Plaintiffs' claims occurred in San Mateo County, pursuant to Local Civil Rule 3.2(d), assignment to the San Francisco Division is proper.

## III. PARTIES

### A. *Plaintiffs*

#### *1. Noel Flores (CA)*

21. Plaintiff Noel Flores is, and at all times mentioned herein was, a citizen of the state of California with his primary place of residence in San Francisco County, California. On or about November 28, 2024, Flores purchased Meta Ray Ban AI Glasses from Meta's Amazon store.

22. Mr. Flores visited Amazon Stores' official product webpage for Meta's Ray Ban AI glasses which prominently advertises that the glasses have "PRIVACY CONTROLS" and that "Ray-Ban Meta glasses put you in control of your privacy."

23. Nowhere does Meta disclose or advertise the magnitude of the extremely intimate moments (videos, audio, images) it discloses to its human contractors for AI-training purposes.

24. Mr. Flores had no idea that merely turning on the glasses' core AI functions would cause Meta to transmit his private data and intimate moments without his consent and saw no disclosures warning him of such practice. Defendants' omissions were material to Plaintiff's decision to purchase the Meta AI Glasses and he would not have purchased them (or would have paid much less for them) had Defendants not made the false and misleading representations and omissions, or had he known of their egregious and shocking privacy violations.

25. Meta had exclusive knowledge that it was sharing Plaintiff's personal recordings with its contractors in Kenya and concealed and/or misled consumers about its practices.

26. Mr. Flores did not know Defendants' privacy representations were false and deceptive—and were not designed to protect his privacy, but rather to expose it for their own self-interest (training Meta's AI models).

27. Mr. Flores would purchase the AI Glasses again if they were actually designed to protect his privacy, as advertised.

***2. Justin Levian (CA)***

28. Plaintiff Justin Levian is, and at all times mentioned herein was, a citizen of the state of California with his primary place of residence in Los Angeles County, California. On or about June, 5, 2025, Levian purchased Meta Ray Ban AI Glasses from Meta's Amazon store.

29. Meta's Amazon store prominently advertises that the glasses have "privacy controls" and that "Ray-Ban Meta glasses put you in control of your privacy."

30. Nowhere does Meta disclose or advertise the magnitude of the extremely intimate moments (videos, audio, images) it discloses to its human contractors for AI-training purposes.

31. Mr. Levian had no idea that merely turning on the glasses' core AI functions would cause Meta to transmit his private data and intimate moments without his consent and saw no disclosures warning him of such practice. Meta's omissions were material to Plaintiff's decision to purchase the Meta AI Glasses, and he would not have purchased them (or would have paid much less for them) had Defendants not made the false and misleading representations and omissions, or had he known of their egregious and shocking privacy violations.

32. Defendants had exclusive knowledge that Meta was sharing Plaintiff's personal recordings with its contractors in Kenya and concealed and/or misled consumers about its practices.

33. Mr. Levian did not know Defendants' privacy representations were false and deceptive—and were not designed to protect his privacy, but rather to expose it for their own self-interest (training Meta's AI models).

34. Mr. Levian would purchase The Meta AI Glasses again if they were actually designed to protect his privacy, as advertised.

***3. Albert Mejia (CA)***

35. Plaintiff Albert Mejia is, and at all times mentioned herein was, a citizen of the state of California with his primary place of residence in Los Angeles County, California. On or about October 2025, Mejia purchased Meta Oakley AI Glasses from an Oakley Retail Store in Glendale, CA.

36. To research and compare both the Meta AI Ray Ban and Oakley glasses before purchasing, Mr. Mejia visited Meta's official product webpage for the Meta AI Glasses, which prominently stated that the glasses were 'designed for privacy' and emphasized features such as 'built-in privacy-by-design architecture' and 'controls that ensure only you decide what is shared.' Relying on these specific representations, which he understood to mean that Meta would not upload or share his intimate recordings with human reviewers or third-party contractors without his informed consent, he decided to purchase the glasses at their full retail price rather than choosing cheaper, non-AI alternatives.

37. In deciding to make the purchase, Mejia viewed and relied on Defendants' advertising and marketing, including Meta's advertising that the AI glasses were "designed for privacy" and would protect his privacy.

38. Nowhere does Meta disclose or advertise the magnitude of the extremely intimate moments (videos, audio, images) it discloses to its human contractors for AI-training purposes.

39. Mr. Mejia had no idea that merely turning on the glasses' core AI functions would cause Meta to transmit his private data and intimate moments without his consent and saw no disclosures warning him of such practice. Meta's omissions

were material to Plaintiff's decision to purchase the product [Meta's Oakley AI Glasses] and he would not have purchased them (or would have paid much less for the products) had Defendants not made the false and misleading representations and omissions, or had he known of their egregious and shocking privacy violations.

40. Meta had exclusive knowledge that it was sharing Plaintiff's personal recordings with its contractors in Kenya and concealed and/or misled consumers about its practices.

41. Mr. Mejia did not know Meta's privacy representations were false and deceptive—and were not designed to protect his privacy, but rather to expose it for their own self-interest (training Meta's AI models).

42. Mr. Mejia would purchase The Meta AI Glasses again if they were actually designed to protect his privacy, as advertised.

***4. Natasha Gauvin (FL)***

43. Plaintiff Natasha Gauvin is, and at all times mentioned herein was, a citizen of the state of Florida with her primary place of residence in Palm Beach County, Florida. On or about November 7, 2025, Ms. Gauvin purchased Meta Ray Ban AI Glasses from Ray Ban's website.

44. In deciding to make the purchase, Ms. Gauvin viewed and relied on Defendants' advertising and marketing, including Meta's advertising that the AI glasses would protect her privacy.

45. Meta's Ray Ban website prominently asserts that the AI glasses are "designed for privacy". Meta's Amazon store prominently advertises that the AI glasses have "privacy controls" and that "Ray-Ban Meta glasses put you in control of your privacy.

46. Nowhere does Meta disclose or advertise the magnitude of the extremely intimate moments (videos, audio, images) it discloses to its human contractors for AI-training purposes.

47. Ms. Gauvin explored the full functionality of her Meta AI glasses upon first use, by wearing them for everything, including reading her mail, bank statements and in encounters with her children. She had no idea that merely turning on the glasses' core AI functions would cause Meta to transmit her private data and intimate moments without her consent and saw no disclosures warning her of such practice. Meta's omissions were material to Plaintiff's decision to purchase the product [Meta's Ray Ban AI Glasses] and she would not have purchased them (or would have paid much less for the products) had Defendants not made the false and misleading representations and omissions, or had she known of their egregious and shocking privacy violations. Meta had exclusive knowledge that it was sharing Plaintiff's personal recordings with its contractors in Kenya and concealed and/or mislead consumers about its practices.

48. Ms. Gauvin did not know Meta's privacy representations were false and deceptive—and were not designed to protect her privacy, but rather to expose it for their own self-interest (training Meta's AI models).

49. Ms. Gauvin would purchase The Meta AI Glasses again if they were actually designed to protect her privacy, as advertised.

***5. Antonio Enriquez (IL)***

50. Plaintiff Antonio Enriquez is, and at all times mentioned herein was, a citizen of the state of Illinois with his primary place of residence in Champaign County, Illinois. On or about November 29, 2025, Enriquez purchased Meta Ray Ban AI Glasses from a Walmart store.

51. In deciding to make the purchase, Enriquez researched The Meta AI Glasses on YouTube and believed that The Meta AI Glasses were "designed for privacy" and would protect his privacy.

52. Nowhere does Meta disclose or advertise the magnitude of the extremely intimate moments (videos, audio, images) it discloses to its human contractors for AI-training purposes.

53. After wearing the glasses while driving and interacting with another driver after a traffic incident, Mr. Enriquez later received comments from acquaintances about the incident which he had only captured using the Meta AI Glasses and had never posted or shared on any social media or messaging platform. This led him to reasonably believe that individuals outside his control had viewed and discussed his recordings, causing him severe distress and fear that his private life was being surveilled by unknown reviewers.

54. Mr. Enriquez had no idea that merely turning on the glasses' core AI functions would cause Meta to transmit his private data and intimate moments without his consent and saw no disclosures warning him of such practice. Meta's omissions were material to Plaintiff's decision to purchase the product [Meta's Ray Ban AI Glasses] and he would not have purchased them (or would have paid much less for the products) had Defendants not made the false and misleading representations and omissions, or had he known of their egregious and shocking privacy violations.

55. Meta had exclusive knowledge that it was sharing Plaintiff's personal recordings with its contractors in Kenya and concealed and/or misled consumers about its practices.

56. Mr. Enriquez did not know Meta's privacy representations were false and deceptive—and were not designed to protect his privacy, but rather to expose it for their own self-interest (training Meta's AI models).

57. Mr. Enriquez would purchase The Meta AI Glasses again if they were actually designed to protect his privacy, as advertised.

***6. Samridh Chhetri (MA)***

58. Plaintiff Samridh Chhetri is, and at all times mentioned herein was, a citizen of the Commonwealth of Massachusetts with his primary place of residence in Middlesex County, Massachusetts. On or about December 9, 2025, Chhetri purchased Meta AI Glasses online through Meta's website.

59. At the time of purchase, Meta did not disclose or advertise the magnitude of the extremely intimate moments (videos, audio, images) it discloses to human contractors for review.

60. Mr. Chhetri had no idea that merely turning on the glasses' core AI functions would cause Meta to transmit his private data and intimate moments without his consent.

61. Mr. Chhetri did not know the privacy representations and omissions were false and deceptive—and were not designed to protect his privacy, but to expose it for Defendants' own self-interest (training Meta's AI models).

62. Mr. Chhetri would not have purchased Meta AI Glasses or would have paid much less for the products, had he known about the privacy violations.

63. Mr. Chhetri would purchase The Meta AI Glasses again if they were actually designed to protect his privacy, as advertised.

***7. Selina Dallas (MI)***

64. Plaintiff Selina Dallas is, and at all times mentioned herein was, a citizen of the state of Michigan with her primary place of residence in Eaton County, Michigan. On or about May, 05 2025, Dallas purchased Meta Ray Ban AI Glasses from a Sunglass Hut retail store after relying on Meta's pervasive marketing, leading her to believe that the Meta AI Glasses were "designed for privacy" and that her private data would not be transmitted without her consent.

65. Nowhere does Meta disclose or advertise the magnitude of the extremely intimate moments (videos, audio, images) it discloses to its human contractors for AI-training purposes.

66. Plaintiff Dallas had no idea that merely turning on the glasses' core AI functions would cause Meta to transmit her private data and intimate moments without her consent and saw no disclosures warning her of such practice. Meta's omissions were material to Plaintiff's decision to purchase the product [Meta's Ray Ban AI Glasses] and she would not have purchased them (or would have paid much

less for the products) had Defendants not made the false and misleading representations and omissions, or had she known of their egregious and shocking privacy violations.

67. Meta had exclusive knowledge that it was sharing Plaintiff's personal recordings with its contractors in Kenya and concealed and/or misled consumers about its practices.

68. Ms. Dallas did not know Meta's privacy representations were false and deceptive—and were not designed to protect her privacy, but rather to expose it for their own self-interest (training Meta's AI models).

69. Ms. Dallas would purchase The Meta AI Glasses again if they were actually designed to protect her privacy, as advertised.

***8. Mohammad Supiro (NY)***

70. Plaintiff Mohammad Suprio is, and at all times mentioned herein was, a citizen of the state of New York with his primary place of residence in Bronx County, New York. On or about August 24, 2024 Suprio purchased Meta Ray Ban AI Glasses from a LensCrafters store.

71. At the time of purchase, Meta did not disclose or advertise the magnitude of the extremely intimate moments (videos, audio, images) it discloses to human contractors for review.

72. Mr. Suprio had no idea that merely turning on the glasses' core AI functions would cause Meta to transmit his private data and intimate moments without his consent and saw no disclosures warning him of such practice. Meta's omissions were material to Plaintiff's decision to purchase the product [Meta's Ray Ban AI Glasses] and he would not have purchased them (or would have paid much less for the products) had Defendants not made the false and misleading representations and omissions, or had he known of their egregious and shocking privacy violations. Meta had exclusive knowledge that it was sharing Plaintiff's personal recordings with its contractors in Kenya and concealed and/or misled consumers about its practices.

73. Mr. Suprio did not know the privacy representations were false and deceptive—and were not designed to protect his privacy, but to expose it for Defendants' own self-interest (training Meta's AI models).

74. Mr. Suprio would purchase The Meta AI Glasses again if they were actually designed to protect his privacy, as advertised.

***9. Nathaniel Marrufo (OH)***

75. Plaintiff Nathaniel Marrufo is, and at all times mentioned herein was, a citizen of the state of Ohio with his primary place of residence in Lucas County, Ohio. On or about November 2024, and again in November 2025, Marrufo purchased Meta Ray Ban AI Glasses from a local optometrist's office..

76. Before purchasing, Mr. Marrufo visited Meta's official product webpage for the Meta AI Glasses, which prominently stated that the glasses were 'designed for privacy' and emphasized features such as 'built-in privacy-by-design architecture' and 'controls that ensure only you decide what is shared.' Relying on these specific representations, which he understood to mean that Meta would not upload or share his intimate recordings with human reviewers or third-party contractors without his informed consent, he decided to purchase the glasses at their full retail price rather than choosing cheaper, non-AI alternatives.

77. In deciding to make the purchase, Marrufo researched The Meta AI Glasses online and on technology blogs and believed that The Meta AI Glasses were "designed for privacy" and would protect his privacy.

78. Nowhere does Meta disclose or advertise the magnitude of the extremely intimate moments (videos, audio, images) it discloses to its human contractors for AI-training purposes.

79. Mr. Marrufo had no idea that merely turning on the glasses' core AI functions would cause Meta to transmit his private data and intimate moments without his consent  and saw no disclosures warning him of such practice. Meta's omissions were material to Plaintiff's decision to purchase the product [Meta's Ray Ban AI

Glasses] and he would not have purchased them (or would have paid much less for the products) had Defendants not made the false and misleading representations and omissions, or had he known of their egregious and shocking privacy violations.

80. Meta had exclusive knowledge that it was sharing Plaintiff's personal recordings with its contractors in Kenya and concealed and/or misled consumers about its practices.

81. Mr. Marrufo did not know Meta's privacy representations were false and deceptive—and were not designed to protect his privacy, but rather to expose it for their own self-interest (training Meta's AI models).

82. Mr. Marrufo would purchase The Meta AI Glasses again if they were actually designed to protect his privacy, as advertised.

***10. Aaliyah Ross (MS)***

83. Plaintiff Aaliyah Ross is, and at all times mentioned herein was, a citizen of the state of Mississippi with their primary place of residence in Tate County, Mississippi. On or about November 27, 2025, Ms. Ross purchased Meta Ray Ban AI Glasses from Meta's Amazon website.

84. In deciding to make the purchase, Ms. Ross viewed and relied on Defendants' advertising and marketing, including Meta's advertising that the AI glasses would protect her privacy.

85. Meta's Ray Ban website prominently asserts that the AI glasses are "designed for privacy". Meta's Amazon store prominently advertises that the AI glasses have "privacy controls" and that "Ray-Ban Meta glasses put you in control of your privacy."

86. Nowhere does Meta disclose or advertise the magnitude of the extremely intimate moments (videos, audio, images) it discloses to its human contractors for AI-training purposes.

87. Ms. Ross had no idea that merely turning on the glasses' core AI functions would cause Meta to transmit her private data and intimate moments

without her consent and saw no disclosures warning her of such practice. Meta's omissions were material to Plaintiff's decision to purchase the product [Meta's Ray Ban AI Glasses] and she would not have purchased them (or would have paid much less for the products) had Defendants not made the false and misleading representations and omissions, or had she known of their egregious and shocking privacy violations. Meta had exclusive knowledge that it was sharing Plaintiff's personal recordings with its contractors in Kenya and concealed and/or mislead consumers about its practices.

88. Ms. Ross did not know Meta's privacy representations were false and deceptive—and were not designed to protect her privacy, but rather to expose it for their own self-interest (training Meta's AI models).

89. Ms. Ross would purchase The Meta AI Glasses again if they were actually designed to protected her privacy, as advertised.

***11. Ray Rodriguez (TX)***

90. Plaintiff Ray Rodriguez is, and at all times mentioned herein was, a citizen of the state of Texas with their primary place of residence in Hidalgo County, Texas. On or about July 26 2025, Rodriguez purchased Meta AI Glasses online through ShopPay.

91. At the time of purchase, Meta did not disclose or advertise the magnitude of the extremely intimate moments (videos, audio, images) it discloses to human contractors for review.

92. Mr. Rodriguez had no idea that merely turning on the glasses' core AI functions would cause Meta to transmit his private data and intimate moments without his consent and saw no disclosures warning him of such practice. Meta's omissions were material to Plaintiff's decision to purchase the product [Meta's Ray Ban AI Glasses] and he would not have purchased them (or would have paid much less for the products) had Defendants not made the false and misleading representations and omissions, or had he known of their egregious and shocking privacy violations. Meta

had exclusive knowledge that it was sharing Plaintiff's personal recordings with its contractors in Kenya and concealed and/or mislead consumers about its practices.

93. Mr. Rodriguez did not know the privacy representations were false and deceptive—and were not designed to protect his privacy, but to expose it for Defendants' own self-interest (training Meta's AI models).

94. Mr. Rodriguez would purchase The Meta AI Glasses again if they were actually designed to protect his privacy, as advertised.

***12. Christopher Taylor (TN)***

95. Plaintiff Christopher Taylor is, and at all times mentioned herein was, a citizen of the state of Tennessee with their primary place of residence in Shelby County, Tennessee. On or about December 2025, Taylor purchased Meta AI Glasses from Best Buy's online store.

96. At the time of purchase, Meta did not disclose or advertise the magnitude of the extremely intimate moments (videos, audio, images) it discloses to human contractors for review.

97. Mr.Taylor had no idea that merely turning on the glasses' core AI functions would cause Meta to transmit his private data and intimate moments without his consent and saw no disclosures warning him of such practice. Meta's omissions were material to Plaintiff's decision to purchase the product [Meta's Ray Ban AI Glasses] and he would not have purchased them (or would have paid much less for the products) had Defendants not made the false and misleading representations and omissions, or had he known of their egregious and shocking privacy violations. Meta had exclusive knowledge that it was sharing Plaintiff's personal recordings with its contractors in Kenya and concealed and/or misled consumers about its practices.

98. Mr.Taylor did not know the privacy representations were false and deceptive—and were not designed to protect his privacy, but to expose it for Defendants' own self-interest (training Meta's AI models).

99. Mr.Taylor would purchase The Meta AI Glasses again if they were actually designed to protect his privacy, as advertised.

***B. Defendants***

100. Defendant Meta Platforms, Inc. is a global technology company that provides social media platforms and communication services to users worldwide as well as advertising services to millions of companies. Meta is comprised of several well-known platforms, including Facebook, Instagram, Threads, and WhatsApp. Meta is incorporated in Delaware with its principal place of business located at 1 Meta Way, Menlo Park, CA 94025. At all relevant times, Meta conducted business in the State of California. Meta is one of the owners, manufacturers, marketers, and distributors of the Meta AI Glasses,

101. Defendant Luxottica of America, Inc. is an Ohio corporation with its principal place of business located at 4000 Luxottica Place, Mason, OH 45040-8114. On information and belief, Luxottica of America, Inc., in partnership with Meta, advertises, markets, and sells the Meta AI Glasses throughout the United States.

## IV. FACTUAL ALLEGATIONS

***A. Background: Defendants' Meta AI Glasses***

102. In September 2025, Defendants' Meta AI Glasses were officially introduced to market, retailing at between $299 and $799.[2] Crafted by high-end manufacturers such as Ray-Ban and Oakley—brands manufactured under the parent company of Defendant Luxottica—the glasses pair with compatible devices and enable AI functionality. The features include calling, texting, engaging an onboard AI assistant, and, crucially, capturing and recording images and videos.

103. Through the integrated assistant, wearers can translate text in real time, identify objects and landmarks, obtain directions, send messages, place calls, and perform a range of hands-free tasks. They can also capture photos and videos without

[2] *Id.*

manual input, record up to three minutes of continuous footage, and livestream a first-person perspective directly to Facebook or Instagram.

104. Each of these functions relies on the same underlying process: when a user initiates a recording, captures an image, or invokes the AI assistant, the Meta AI Glasses transmit what the wearer sees to Meta's cloud servers, where it is analyzed using visual recognition, location data, and other contextual inputs, and then stored and used to train Meta's AI models. This transfer occurs in real time regardless of the wearer's environment—on a public street, their child's nursery school, their bedroom, or their bathroom.

105. On information and belief, when users activate the Meta AI assistant during video or photo capture, the device records and stores a complete copy of the surrounding scene—including any faces, bodies, and objects in the frame—in unencrypted form on the paired mobile device. When the user subsequently connects to Wi-Fi, the companion app automatically uploads this content to Meta-controlled servers located in the United States and abroad for processing and human review.

### *B. Defendants Misrepresent to Consumers that the Meta AI Glasses are "Designed for Privacy"*

106. The Glasses' capacity to silently capture, transmit, and store imagery from virtually any environment has generated significant privacy concerns. Meta's April 2025 update to the product's privacy policy—requiring certain AI features to remain "always on"—heightened public unease.[3] In response, Defendants launched an extensive public marketing campaign portraying the Glasses as "designed for privacy, controlled by you," to reassure consumers and drive adoption.[4]

---

[3] Meta's Controversial Data Policy on Ray-Ban Smart Glasses Sparks Privacy Debate, OpenTools.ai (May 1, 2025), https://opentools.ai/news/metas-controversial-data-policy-on-ray-ban-smart-glasses-sparks-privacy-debate.

[4] Screenshot taken from Ray Ban Meta AI Glasses Privacy, Meta, https://www.meta.com/ai-glasses/privacy/. (last visited Mar. 12, 2026).

107. Defendants repeatedly assured consumers that they would retain control over their personal data. On a webpage dedicated to the product's privacy features, Meta proclaims: "You're in control of your data and content," touting "clear, easy device and app settings" that ostensibly allow users to manage their information and determine "what content you choose to share with others, and when."[5]

108. Meta has numerous privacy policies associated with its Meta AI Glasses. For example, Meta's privacy policy for wearables explains that photos and videos taken with its smart glasses are sent to Meta "when you turn on cloud processing on your AI Glasses, interact with the Meta AI service on your AI Glasses, or upload your media to certain services provided by Meta (i.e., Facebook or Instagram). You can change your choices about cloud processing of your Media at any time in Settings." However, beginning in August of 2025, Meta made "Meta AI with camera" **on by default** until a user turns off support for the "Hey Meta" voice command.

109. Meta's policy also says that video and audio from livestreams recorded with the Meta AI Glasses are sent to Meta, as are text transcripts and voice recordings created by Meta's chatbot. "We use machine learning and trained reviewers to process this data to improve, troubleshoot, and train our products. We share that information with third-party vendors and service providers to improve our products. You can access and delete recordings and related transcripts in the Meta AI App," the policy says. Meta's broader privacy policy for the Meta AI chatbot adds: "In some cases, Meta will review your interactions with AIs, including the content of your conversations with or messages to AIs, and this review may be automated or manual (human)." That policy also warns users against sharing "information that you don't want the AIs to use and retain, such as information about sensitive topics."

[5] *Id.*

110. But to use the AI features that are the central selling point of the Meta AI Glasses—the only reason a consumer would choose to purchase them over ordinary eyewear—the consumer has no choice but to share information.

111. Indeed, according to the 2026 investigation by Swedish newspaper Svenska Dagbladet,[6] when the reporters purchased the Meta AI Glasses and attempted to use the AI tool offline, the tool would not function without an internet connection at all. When reporters turned on internet connectivity, their phones immediately connected to multiple Meta-controlled servers, despite no user-initiated sharing action. The reporters traced these connections to domains associated with Meta's data labeling operations and determined that the central function of the glasses required the user to enable the transmission of user-captured footage to data labeling offices for human review.

112. Moreover, the whistleblower employees tasked with reviewing the content collected by the Meta AI Glasses have suggested that consumers may sometimes be unaware that the devices are recording. Employees reportedly pointed to users recording their bank card or pornography that they're watching, seemingly inadvertently.

113. Meta has made statements suggesting that certain steps are being taken to anonymize individuals recorded by the Meta AI Glasses. "This data is first filtered to protect people's privacy," a statement by Meta said, pointing to, as an example, blurring out faces in images. But the whistleblower data annotators have seen firsthand that the promised anonymization does not always work as intended. Faces that are to be covered are sometimes visible. And Meta's own former employees have

[6] Meta's AI Smart Glasses and Data Privacy Concerns: Workers Say "We See Everything," Svenska Dagbladet (Feb. 27, 2026), https://www.svd.se/a/K8nrV4/metas-ai-smart-glasses-and-data-privacy-concerns-workers-say-we-see-everything.

explained that: “The algorithms sometimes miss. Especially in difficult lighting conditions, certain faces and bodies become visible.”[7]

114. The Meta AI Glasses website even instructs users “How to wear your Ray-Ban Meta Glasses responsibly,” encouraging practices that help others feel “safe and comfortable while you’re wearing your Glasses.” This messaging reinforces the impression that Defendants prioritize privacy and that consumers can use the product in a manner that keeps personal data “safe.”[8]

115. In practice, however, users have no meaningful control over what happens to their data—or the data they capture about people around them. Defendants do not keep this information “safe.” Meta transmits consumer-generated data to a subcontractor, Sama, where thousands of workers in Nairobi, Kenya, serve as data annotators.[9] These workers review sensitive user content and label it—tagging objects such as “cars,” “lamps,” and “people”—to train Meta’s AI systems.[10]

***C. Defendants Knowingly Concealed the Intimate Nature of the Content Accessible and Reviewable by Defendants’ Employees and Contractors***

116. Meta’s employees contracted to review the data captured by the Meta AI Glasses report encountering deeply private video clips, including footage of bathroom use, sexual activity, and other intimate moments.[11] One worker described a video in which a man placed his Glasses on a bedside table before leaving the room; moments later, his spouse entered and unknowingly changed clothes in front of the still-recording device.[12] Without the consent the woman’s knowledge or consent that

[7] *Id.*
[8] Meta AI Glasses Privacy, *supra*.
[9] *“We See Everything,” supra.*
[10] *Id.*
[11] *Id.*
[12] *Id.*

her naked body been captured at all, these images were transferred to and viewed by Meta's human content reviewers.[13]

117. Other Meta employees report viewing videos containing visible bank cards, private text messages, and additional sensitive information. This data remains stored in Meta's systems, accessible to human annotators and available indefinitely for use in Meta's AI products.[14] In interviews published in a Swedish investigative news report Meta's subcontractors revealed extreme invasions of privacy in the content transmitted by the Meta AI Glasses for their review: "I saw a video where a man puts the glasses on the bedside table and leaves the room. Shortly afterwards, his wife comes in and changes her clothes," an anonymous Sama employee reportedly said, per the machine translation.[15] Another Meta subcontractor explained: "We see everything, from living rooms to naked bodies. Meta has that type of content in its databases. People can record themselves in the wrong way and not even know what they are recording," an anonymous employee was quoted as saying.[16]

118. Despite Defendants' assurances that they "take steps to protect people's privacy, like removing key identifiable information," and despite their stated policy of automatically blurring faces in annotation data, Meta's international employees report that anonymization measures frequently fail; faces that should have been obscured were often still visible.[17]

119. Consumer data collected through the Meta AI Glasses is enormously valuable to Meta. Fresh data is essential to AI development, and as publicly available

---

[13] *Id.*

[14] *Id.*

[15] Scharon Harding, Workers Report Watching Ray-Ban Meta-Shot Footage of People Using the Bathroom, Ars Technica (Mar. 5, 2026), https://arstechnica.com/gadgets/2026/03/workers-report-watching-ray-ban-meta-shot-footage-of-people-using-the-bathroom/.

[16] *Id.*

[17] Screenshot taken from Ray Ban Meta AI Glasses Privacy, Meta, https://www.meta.com/ai-glasses/privacy/. (last visited Mar. 12, 2026).

datasets become depleted, proprietary data sources can cost hundreds of millions of dollars.[18] Instead of purchasing such data, Meta harvests personal information from unsuspecting consumers who have already paid for the product—turning them into unwitting data sources without their knowledge or consent.

120. Despite promoting the Glasses as "designed for privacy" and equipped with "robust measures to protect user data," Defendants failed to disclose that the devices routinely capture intimate videos, images, and audio; transmit that content to Meta's servers; and make it available for review by Defendants' employees and contractors. This omission directly contradicts Meta's affirmative privacy representations and has resulted in consumers' most private moments being exposed to thousands of individuals.

121. These undisclosed practices—and Meta's handling of highly sensitive user data—were material to any reasonable consumer evaluating whether to purchase the Glasses. A reasonable consumer would not anticipate that footage captured during ordinary daily activities would be transmitted to third-party human contractors for review, particularly when the device accompanies users into their most private spaces: homes, bathrooms, bedrooms, and other intimate environments.

122. The exposure of such recordings would be profoundly unexpected. While users might understand that wearable AI devices process visual data automatically to improve functionality, they would not reasonably expect that strangers—often located in other countries—would be watching, analyzing, and labeling their most intimate moments.

123. Transmitting users' private recordings to overseas contractors also created clear and foreseeable risks. Once such footage is sent to third-party human reviewers, those individuals can copy, retain, distribute, or exploit the recordings for harassment, blackmail, public dissemination, identity theft, or other harmful purposes.

---

[18] Hamidah Oderinwale & Anna Kazlauskas, The Economics of AI Training Data: A Research Agenda, arXiv (Oct. 28, 2025), https://arxiv.org/html/2510.24990.

By concealing the transmission, review, and sharing of this data, Defendants deprived consumers of material information necessary to make an informed decision about whether to purchase or use the Glasses.

124. Defendants have known since the products' launch in 2021 that human review of user-generated videos, audio, and images would inevitably expose intimate content. The risks associated with human review of data from always-on wearable cameras are well recognized in the technology industry, placing Defendants on direct notice that consumers expect disclosure of such practices and that nondisclosure creates significant privacy harms.

125. Despite their actual knowledge of the human-review pipeline and the inherent privacy and safety risks it poses, Defendants have continued to market the Glasses using the same "designed for privacy" representations.

126. By emphasizing purported privacy protections while concealing the critical fact that intimate footage is routinely reviewed by Defendants' employees and contractors, Defendants created a false impression that the product offers comprehensive privacy safeguards. In reality, the touted features address only superficial device interactions and do nothing to mitigate the most serious privacy risk the Glasses create: the exposure of users' intimate recordings to strangers.

***D. Defendants' Glaring Privacy Violations Present an Unreasonable and Undisclosed Safety Risk to Consumers***

127. Defendants' failure to disclose magnitude and scope of intimate content that was intentionally sent to and reviewed by Meta's subcontractors strikes at the core functionality of the Meta AI Glasses. Although Defendants marketed the device's privacy architecture as a foundational feature and an essential safeguard for a camera and microphone designed to be worn throughout daily life, including in intimate settings. Yet without disclosure of the scope of images reviewed by Meta's human-reviewer subcontractors, consumers could not understand the true privacy implications of using the device. For any consumer unwilling to have intimate

moments transmitted to Meta's servers and reviewed by offshore human contractors, the product's AI capabilities are deceptively unusable, leaving them having paid hundreds of dollars for a pair of glasses devoid of the "smart" functionality they paid for.

128. Independent of its impact on functionality, this material omission by Defendants of their widescale invasion of privacy creates an unreasonable safety risk for consumers. It renders the marketed privacy features materially misleading, effectively transforming the Meta AI Glasses from personal tools into surveillance conduits, and exposes users to significant risks of harm, emotional distress, stalking, extortion, identity theft, and reputational injury.

129. The exposure of such content to thousands of unknown individuals creates a persistent and unreasonable risk of harm—the very risk the product's advertised privacy protections were represented to prevent, but do not.

130. Defendants continue to market, sell, and update the Meta AI Glasses, including updated models and software versions, using the same or substantially similar "designed for privacy" representations and data-handling practices. Plaintiffs are current and prospective purchasers of wearable technology and would seriously consider purchasing AI-enabled smart glasses in the future. However, because they now know that Defendants' privacy representations were misleading and that Defendants have not made full, transparent disclosures about their human-review pipeline, Plaintiffs cannot rely on Defendants' statements and remain at risk of future harm absent a court-ordered change in Defendants' practices and corrective disclosures.

## V. CLASS ACTION ALLEGATIONS

131. **Class Definition.** Plaintiffs bring this action as a class action on behalf of themselves, and all others similarly situated pursuant to Federal Rules of Civil Procedure, Rule 23(a) and 23(b)(3) defined as follows:

**Nationwide Class:**

All persons or entities who purchased and/or used the Meta AI Glasses in the United States and enabled AI functionality at least once.

**California Subclass:**

All persons or entities who purchased and/or used the Meta AI Glasses in the State of California and enabled AI functionality at least once.

**Florida Subclass:**

All persons or entities who purchased and/or used the Meta AI Glasses in the State of Florida and enabled AI functionality at least once.

**Illinois Subclass:**

All persons or entities who purchased and/or used the Meta AI Glasses in the State of Illinois and enabled AI functionality at least once.

**Massachusetts Subclass:**

All persons or entities who purchased and/or used the Meta AI Glasses in the State of Massachusetts and enabled AI functionality at least once.

**Michigan Subclass:**

All persons or entities who purchased and/or used the Meta AI Glasses in the State of Michigan and enabled AI functionality at least once.

**Mississippi Subclass:**

All persons or entities who purchased and/or used the Meta AI Glasses in the State of Mississippi and enabled AI functionality at least once.

**New York Subclass:**

All persons or entities who purchased and/or used the Meta AI Glasses in the State of New York and enabled AI functionality at least once.

**Ohio Subclass:**

All persons or entities who purchased and/or used the Meta AI Glasses in the State of Ohio and enabled AI functionality at least once.

**Tennessee Subclass:**

All persons or entities who purchased and/or used the Meta AI Glasses in the State of Tennessee and enabled AI functionality at least once.

**Texas Subclass:**

All persons or entities who purchased and/or used the Meta AI Glasses in the State of Texas and enabled AI functionality at least once.

132. Collectively, the Nationwide Class and the California, Florida, Illinois, Massachusetts, Michigan, Mississippi, New York, Ohio, Tennessee, and Texas Subclasses (together, "**State Subclasses**") are referred to as the "**Classes**".

133. The "**Glasses**," and "**Meta AI Glasses**" are collectively defined and referred to herein as the following products: Ray-Ban Stories (Skyler, Wayfarer, and Headliner); Ray-Ban Meta Gen 1 (Skyler, Wayfarer, and Headliner); Ray-Ban Meta Gen 2 (Skyler, Wayfarer, Headliner); Oakley Meta HSTN; Oakley Meta Vanguard; and Meta Ray-Ban Display.

134. **Class Definition Exclusions**. Excluded from the Classes are: (i) Defendants, their assigns, successors, and legal representatives; (ii) any entities in which Defendants have controlling interests; (iii) federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and (iv) any judicial officer presiding over this matter and person within the third degree of consanguinity to such judicial officer.

135. **Reservation of Rights to Amend the Class Definitions**. Plaintiffs reserve the right to amend or otherwise alter the class definitions presented to the Court at the appropriate time in response to facts learned through discovery, legal arguments advanced by Defendants, or otherwise.

136. **Numerosity**. Members of the Classes are so numerous that joinder of all members is impracticable. The Nationwide Class consists of millions of purchasers dispersed throughout the United States, and the State Subclasses likewise, likely

consist of at least tens of thousands of purchasers (if not more) dispersed throughout the States of California, Florida, Illinois, Massachusetts, Michigan, Mississippi, New York, Ohio, Tennessee, and Texas. Accordingly, it would be impracticable to join all members of the Classes before the Court.

137. **Common Questions Predominate**. There are numerous and substantial questions of law or fact common to all members of the Classes that predominate over any individual issues. Such questions include, but are not limited to:

a. Whether the Meta AI Glasses were defectively designed;

b. Whether Defendants failed to adequately warn Plaintiffs and the Class about the products' defective nature;

c. Whether Defendants engaged in unlawful, unfair, or deceptive business practices by advertising and selling the products;

d. Whether Defendants' conduct of advertising and selling the Meta AI Glasses was false and/or deceptive;

e. Whether Defendants' conduct is an unfair business practice within the meaning of California Business and Professions Code section 17200, *et seq.*;

f. Whether Defendants' conduct is a fraudulent business practice within the meaning of California Business and Professions Code section 17200, *et seq.*;

g. Whether Defendants' conduct is an unlawful business practice within the meaning of California Business and Professions Code section 17200, *et seq.*;

h. Whether Defendants' challenged representations and omissions are deceptive in violation of California Business and Professions Code sections 17500, *et seq.*;

i. Whether Defendants' advertising and marketing of the Meta AI Glasses are misleading in violation of California Business and Professions Code section 17500, *et seq.*;

j. Whether Defendants knew, or by the exercise of reasonable care should have known, that their advertising and marketing practices were and are misleading in violation of California Business and Professions Code section 17500, *et seq.*;

k. Whether Defendants' challenged representations and omissions represent that the Meta AI Glasses have characteristics, uses, or benefits that they do not have, in violation of California Civil Code section 1770(a)(5);

l. Whether Defendants' challenged representations and omissions represent that the Meta AI Glasses are of a particular standard, quality, or grade when they are of another, in violation of California Civil Code section 1770(a)(7);

m. Whether Defendants' challenged representations and omissions advertise the Meta AI Glasses with the intent not to sell as advertised in violation of California Civil Code section 1770(a)(9);

n. Whether Defendants affirmatively misrepresented the capabilities, quality, and nature of the Meta AI Glasses and knew their misrepresentations are material to consumers;

o. Whether Defendants had a duty to disclose the omitted facts that are material to consumers with their challenged representations and omissions;

p. Whether Defendants knew or should have known that the qualities and characteristics of the products were not as advertised, marketed, or otherwise represented or suitable for their intended use and were otherwise not as warranted and represented by Defendants;

q. Whether Defendants breached the terms of their contracts with the consumers, including the express warranties, by not providing products that conform to the advertising and marketing claims;

r. Whether Defendants breached the implied warranty of merchantability to Plaintiffs and the Classes in their challenged representations and omissions;

s. Whether Plaintiffs and the Classes paid more money for the Meta AI Glasses than they actually received;

t. How much more money Plaintiffs and the Classes paid for the Meta AI Glasses than they actually received;

u. Whether Plaintiffs and the Classes are entitled to injunctive relief; and

v. Whether Defendants were unjustly enriched by their unlawful conduct.

138. **Predominance**. The common questions of law and fact predominate over questions that affect only individual Class Members.

139. **Typicality**. Plaintiffs' claims are typical of the claims of the Class Members that Plaintiffs seek to represent because Plaintiffs, like the Class Members, purchased Defendants' misleading and deceptive products. Defendants' unlawful, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced. Plaintiffs and the Class sustained similar injuries arising out of Defendants' conduct. Plaintiffs' and Class Members' claims arise from the same practices and course of conduct and are based on the same legal theories.

140. **Adequacy**. Plaintiffs are adequate representatives of the Classes they seek to represent because Plaintiffs' interests do not conflict with the interests of the Class Members. Plaintiffs will fairly and adequately protect Class Members' interests and have retained counsel experienced and competent in the prosecution of complex class actions, including complex questions that arise in consumer protection litigation.

141. **Ascertainability**. Class Members can easily be identified by an examination and analysis of the business records regularly maintained by Defendants, among other records within Defendants' possession, custody, or control. Additionally, further Class Member data can be obtained through additional third-party retailers who retain customer records and order histories. All Meta AI Glasses have to be registered when activated, during which time Meta collects the information about the user, including their email addresses and more – and thus maintains information regarding the users.

142. **Superiority and Substantial Benefit**. A class action is superior to other methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Classes is impracticable and no other group method of adjudication of all claims asserted herein is more efficient and manageable for at least the following reasons:

a. The claims presented in this case predominate over any questions of law or fact, if any exist at all, affecting any individual member of the Classes;

b. Absent a Class, the members of the Classes will continue to suffer damage and Defendants' unlawful conduct will continue without remedy while Defendants profit from and enjoy their ill-gotten gains;

c. Given the size of individual Class Members' claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendants committed against them, and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

d. When the liability of Defendants has been adjudicated, claims of all members of the Classes can be administered efficiently and/or determined uniformly by the Court; and

e. This action presents no difficulty that would impede the management by the Court as a class action, which is the best available means by which Plaintiffs and Class Members can seek redress for the harm caused to them by Defendants.

143. **Inconsistent Rulings**. Because Plaintiffs seek relief for all members of the Classes, the prosecution of separate actions by individual members would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendants.

144. **Injunctive/Declaratory Relief**. The prerequisites to maintaining a class action for injunctive or equitable relief are met as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or declaratory relief with respect to the Classes as a whole.

145. **Manageability**. Plaintiffs and Plaintiffs' counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

146. **Issues Classes**. Alternatively, Plaintiffs seek certification pursuant to Federal Rule of Civil Procedure 23(c)(4) on behalf of the above-defined Classes for some or all the issues identified in the commonality and predominance section, above, as well as other issues that may be later identified.

## VI. CAUSES OF ACTION

### COUNT I

### STRICT PRODUCT LIABILITY – DESIGN DEFECT

### (Brought by all Plaintiffs against Defendants Meta and Luxottica on behalf of the Nationwide Class, or alternatively, the State Subclasses)

147. Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

148. Plaintiffs bring this claim individually and on behalf of the Nationwide Class, or alternatively, the State Subclasses. This claim is brought under California

law or, alternatively, the laws of the respective states where Plaintiffs and Class Members purchased and/or used the products.

149. Meta and Luxottica designed, engineered, manufactured, marketed, distributed, and sold the products to Plaintiffs and Class Members.

150. Meta and Luxottica placed the products into the stream of commerce, knowing and intending that they would be purchased and used by Plaintiffs and Class Members throughout the United States without any inspection for defects by end users.

151. The products were defective in design when they left Defendants' possession and control because, inter alia, they were designed so that, during ordinary and intended use: (1) they capture continuous photo and video content, including inside homes, bedrooms, and bathrooms, and during other intimate moments; (2) that content is automatically transmitted off-device to Meta's servers and then to human "data annotators" overseas for review and labeling; and (3) this pipeline of intimate, sensitive footage to human annotators is implemented without adequate in-product controls or transparent, conspicuous disclosures consistent with Defendants' privacy-centric representations.

152. Though Meta has publicly acknowledged that it "sometimes use[s] contractors to review" users' data, purportedly to improve the service, it has claimed that, "unless users choose to share media they've captured with Meta or others, that media stays on the user's device" and that any content users do choose to share is "filtered to protect people's privacy."

153. Defendants simultaneously marketed the products with privacy-centric statements, including that the products are "designed for privacy, controlled by you," "built for your privacy," and similar representations suggesting robust privacy protections and user control over captured content.

154. No reasonable consumer would expect that, by using a product advertised as "designed for privacy" in ordinary, foreseeable ways (e.g., wearing it at

home, in bedrooms or bathrooms, while undressing, or around family members), their intimate video and audio would be routed to and watched by strangers overseas, cataloguing their "bathroom visits, sex and other intimate moments," and financial details for AI-training purposes.

155. The products failed to perform as safely as an ordinary consumer would expect because, contrary to Defendants' privacy-centric marketing: (1) they function as surreptitious conduits of highly sensitive and intimate personal and bystander data to human annotators; and (2) the products' design, including reliance on a small LED indicator light, does not ensure that users or bystanders meaningfully understand that their intimate moments and environments are being recorded, offloaded, and reviewed.

156. Any purported benefits of designing the products to route intimate user and bystander footage to human annotators—rather than relying on less invasive or more privacy-protective AI-training methods—are outweighed by the gravity and likelihood of harm, including: (1) exposure of highly intimate, sexual, and bodily content to strangers; (2) exposure of financial information; (3) heightened risks of identity theft, stalking, extortion, and reputational harm; and (4) economic harm from paying for a product that does not conform to its privacy-centric marketing.

157. Plaintiffs and Class Members used the products in intended and reasonably foreseeable ways, including wearing them in daily life, inside homes, and around family and friends.

158. A safer alternative design that would have eliminated or reduced injuries to Plaintiffs' privacy was technically and commercially feasible. For example, Meta and Luxottica could have designed the products such that use of and access to the products' core AI features was decoupled from the human review pipeline or required explicit user consent for each piece of footage routed to human contractors.

159. The products' defective design was a substantial factor in causing Plaintiffs' and Class Members' injuries, including economic harm (paying a price

premium and/or the purchase price itself for products that were not as represented) and loss of the benefit of their bargain, as well as loss of privacy and dignitary harms associated with the exposure of intimate footage to human annotators.

160. Plaintiffs and Class Members would not have purchased the products, or would have paid significantly less for them, had they known of the products' true design and the attendant privacy risks.

161. As a direct and proximate result of Defendants' defective design, Plaintiffs and Class Members have suffered and will continue to suffer injury, including ascertainable losses of money or property, and non-economic harms relating to invasion of privacy and emotional distress.

162. Plaintiffs and Class Members seek all monetary and non-monetary relief allowed by law as a result of Defendants' strict product liability, including compensatory damages, restitution, disgorgement, punitive damages where available, and attorneys' fees and costs.

**COUNT II**

**STRICT PRODUCT LIABILITY – FAILURE TO WARN**

**(Brought by all Plaintiffs against Defendants Meta and Luxottica on behalf of the Nationwide Class, or alternatively, the State Subclasses)**

163. Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

164. Plaintiffs bring this claim individually and on behalf of the Nationwide Class, or alternatively, the State Subclasses. This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs and Class Members purchased and/or used the products.

165. Defendants manufactured, designed, marketed, distributed, and sold the products.

166. At the time the products were manufactured, distributed, and sold, they had potential and known risks that were known or knowable in light of generally

accepted knowledge in the relevant communities, including that: (1) the products capture highly sensitive video and audio inside private spaces; (2) that media is transmitted to Meta's servers and routed to human annotators in Nairobi, Kenya for review and labeling; (3) annotators "see everything—from living rooms to naked bodies," including bathroom visits, sexual activity, and financial information; (4) it is impossible to both avoid the human review pipeline and make use of the products' core AI features; and (4) such practices create serious privacy, safety, and dignitary harms.

167. These potential risks present a substantial danger when the products are used or misused in an intended or reasonably foreseeable manner because users will naturally wear the products in homes, bathrooms, bedrooms, and other intimate settings, with spouses, partners, children, guests, and bystanders present.

168. Ordinary consumers are not likely to recognize these risks, particularly given the products' marketing as "designed for privacy, controlled by you" and the absence of any clear disclosure that human contractors overseas watch and annotate sensitive footage captured via the products and that users who wish to make use of the products' core AI features cannot avoid that human review pipeline.

169. At all relevant times, safer and feasible alternative designs existed that would have substantially reduced or eliminated the unreasonable privacy and safety risks created by the Meta AI Glasses, including: (a) performing AI processing entirely on-device, without uploading raw, identifiable content to remote servers; (b) limiting uploads to anonymized or redacted images that remove faces, bodies, and other identifying features; (c) obtaining explicit, granular, opt-in consent before routing any content to human reviewers and limiting such review to non-intimate scenes; and (d) allowing users to permanently disable any upload of AI-related content while still retaining local AI functionality. Defendants nevertheless opted for a design that maximized the volume of intimate, identifiable data sent to offshore human reviewers, without disclosing these tradeoffs to consumers.

170. Defendants failed to provide adequate warnings or instructions concerning: (1) the fact that content captured with the products would be transmitted to Meta's servers for AI-related processing; (2) the fact that human contractors, including those working for Meta's vendor Sama in Nairobi, would review and annotate highly sensitive user and bystander footage, including bathroom, sexual, and financial scenes; and (3) the nature and extent of privacy, safety, and dignitary risks created by this human-review pipeline.

171. The small LED indicator light on the products is inadequate as a warning or notice to users or bystanders regarding the existence and extent of human review and data-annotation practices; it does not meaningfully inform consumers that their intimate footage may be watched by strangers overseas.

172. Meta's claims that it disclosed to users that some footage may be shared with human reviewers, even if true, are inadequate, because consumers were not provided adequate notice of these supposed disclosures, and these disclosures do not meaningfully inform consumers who wish to make use of the products' core AI features that they cannot do so while avoiding that human review pipeline.

173. Defendants knew or, by the use of reasonably developed skill and foresight, should have known of these risks and of the products' human-review pipeline, as evidenced by: (1) their own design and implementation of the products and related AI systems; (2) their contracting with Sama and other vendors; and (3) internal knowledge that intimate footage, including nudity, sex, and financial information, was being viewed by annotators.

174. Defendants had a duty to provide clear, prominent warnings and instructions so that consumers could decide whether to use the products at all, or use them in ways that would minimize the degree of danger—such as by avoiding use in bathrooms and bedrooms or when handling financial information.

175. Defendants breached this duty by failing to provide adequate warnings and instructions and by instead emphasizing privacy-centric marketing messages inconsistent with the underlying data-handling and human-review practices.

176. Plaintiffs and Class Members were injured, including economic losses (purchase price, price premium, loss of benefit of the bargain), and non-economic harms (invasion of privacy, emotional distress), as a direct and proximate result of Defendants' failure to warn.

177. Had Defendants provided adequate warnings and instructions about the products' human-review pipeline and associated risks, Plaintiffs and Class Members would not have purchased the products, or would have paid significantly less for them, and would have avoided or mitigated their harm.

178. Defendants' failure to warn was a substantial factor in causing Plaintiffs' and Class Members' injuries.

179. Plaintiffs and Class Members seek all monetary and non-monetary relief allowed by law, including compensatory damages, restitution, disgorgement, punitive damages where available, and attorneys' fees and costs.

## <u>COUNT III</u>

## VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT U.S.C. § 1030 *et seq.*)

**(Brought by all Plaintiffs against Defendant Meta on behalf of the Nationwide Class, or alternatively, the State Subclasses)**

180. Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

181. Plaintiffs bring this claim individually and on behalf of the Nationwide Class, or alternatively, the State Subclasses, against Meta.

182. A person violates the Computer Fraud and Abuse Act ("CFAA") if they intentionally access a protected computer, lacked authority to access the computer or exceeded granted authority to access the computer, and thereby obtain information

from any protected computer. *See* 18 U.S.C. § 1030(a)(2)(C). A "protected computer" includes one that is used in or affecting interstate or foreign commerce. 18 U.S.C.§ 1030(e)(2).

183. The products are "protected computers" under the CFAA because they process and store data and are connected to the Internet.

184. In connection with the design and operation of the products and associated services, Meta used its access to those protected computers to obtain and alter Plaintiffs' and Class Members' data in ways that exceeded the scope of authorization Plaintiffs and Class Members granted, by:

a. using data and media captured via the products for purposes not authorized by Plaintiffs and Class Members, including routing intimate footage to human annotators in Nairobi to watch, label, and use in AI-model training;

b. obtaining and using intimate media and associated data beyond what was reasonably necessary to provide the advertised consumer-facing functionality; and

c. using deceptive and privacy-centric marketing to induce Plaintiffs and Class Members to transmit data to Meta's systems while concealing the human review and AI-training uses of that data.

185. Plaintiffs and Class Members did not authorize Meta to expose their intimate footage—including bathroom visits, sex, nudity, and financial information—to human contractors overseas, nor did they authorize Meta to use such footage in the undisclosed manner alleged, particularly considering Meta's privacy-centric representations.

186. Meta knew, or recklessly and intentionally disregarded the extremely high likelihood that, its use of Plaintiffs' and Class Members' data, as described above, exceeded the authorization that Plaintiffs and Class Members had granted.

187. As a direct and proximate result of Meta's violations of the CFAA, Plaintiffs and Class Members suffered damage and loss within the meaning of 18 U.S.C. § 1030, including:

a. economic losses in the form of the purchase price and/or a price premium for products they would not have purchased, or would not have paid as much for, had they known the truth;
b. the loss of the value and confidentiality of their data; and
c. costs reasonably incurred in investigating and responding to Meta's conduct, and in seeking to remediate the privacy harms described herein.

188. Plaintiffs and Class Members seek all remedies available under 18 U.S.C. § 1030, including compensatory damages, injunctive and other equitable relief, and reasonable attorneys' fees and costs.

## COUNT IV

## INTRUSION UPON SECLUSION

**(Brought by all Plaintiffs against Defendant Meta on behalf of the Nationwide Class, or alternatively, the State Subclasses)**

189. Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

190. Plaintiffs bring this claim individually and on behalf of the Nationwide Class, or alternatively, the State Subclasses, against Defendant Meta. This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs and Class Members purchased and/or used the products.

191. Plaintiffs and Class Members have a reasonable expectation of privacy in the seclusion of their homes and other private spaces, including bedrooms, bathrooms, and other locations where they undress, engage in sexual activity, perform intimate bodily functions, spend time with family members, and handle sensitive financial information.

192. Plaintiffs and Class Members also have a reasonable expectation that highly intimate and sensitive activities occurring in such spaces will not be intentionally observed or monitored by strangers—such as overseas contractors working for Meta—without clear, conspicuous, explicit, and informed consent.

193. Meta intentionally designed, deployed, and operated the products and associated backend systems so that, without authorization and in the ordinary course of use:

a. the products capture video and audio in intimate, private spaces, including homes, bathrooms, and bedrooms;

b. that content is transmitted off device from Plaintiffs' and Class Members' environments to Meta's servers; and

c. human "data annotators," including contractors in Nairobi, Kenya, working for Meta's vendor Sama, then view and label sensitive user and bystander footage, including bathroom visits, sex, nudity, and financial information, in order to train Meta's AI models.

194. Workers employed as data annotators for Meta's vendor Sama have reported that, in the course of their work annotating footage from Meta AI Glasses, they "see everything, from living rooms to naked bodies," including videos of bathroom visits, sexual activity, and other deeply personal moments, as well as bank and credit-card details. These are indisputably private matters

195. Meta has acknowledged that it "sometimes" uses contractors to review that data to improve the service, and that such review may involve human annotators, while claiming that such review does not occur "unless users choose to share media they've captured with Meta" and that such data are "filtered to protect people's privacy."

196. Meta, from the design and operation of the products and from its relationship with Sama, knew that annotators were being exposed to private, highly intimate footage from users' homes, including bathroom visits, nudity, sex, and

financial information, and that purported anonymization or blurring safeguards did not reliably prevent identification of individuals.

197. Meta's intentional conduct constitutes a substantial, unjustified intrusion into Plaintiffs' and Class Members' seclusion and private affairs because it:

a. causes continuous capture and off-device transmission of deeply intimate data from the most private spaces in users' homes;
b. exposes that data to unknown human annotators thousands of miles away; and
c. does so while marketing the products as "designed for privacy, controlled by you," "built for your privacy," and equipped with "robust measures to protect user data."

198. Meta's intrusion would be highly offensive to a reasonable person because a reasonable consumer would not expect that. by wearing purportedly "privacy-designed" glasses during everyday activities inside the home, including in bathrooms and bedrooms, their intimate moments would be viewed and catalogued by human workers overseas or their intimate footage used to train AI models in ways that they do not understand and to which they did not consent and could not have meaningfully consented.

199. Plaintiffs and Class Members did not consent, and could not reasonably be deemed to have consented, to this intrusion, because Meta:

a. failed to clearly and conspicuously disclose that human annotators would routinely watch and label intimate footage captured via the products;
b. failed to clearly disclose the nature, extent, and scope of the human review pipeline; and
c. affirmatively reassured consumers through privacy-centric marketing that the products were "designed for privacy," and that users would

maintain control over their data, and that the products had "robust measures to protect user data."

200. Any notification potentially implied by the products' LED recording indicator is inadequate to constitute informed consent to Meta's human review pipeline because the LED light does not inform users or bystanders that footage will be transmitted to Meta's servers and reviewed by human annotators, and Meta continued to conceal the specific human review and AI-training practices at issue while promoting the products as privacy-protective.

201. Meta's claims that it disclosed to users that some footage may be shared with human reviewers, even if true, are inadequate to constitute informed consent because consumers were not provided adequate notice of these supposed disclosures, these disclosures do not meaningfully inform consumers who wish to make use of the products' core AI features that they cannot do so while avoiding the human review pipeline, and they fail to meaningfully inform consumers of the nature, extent, and scope of the human review pipeline.

202. Meta's intrusion caused Plaintiffs and Class Members mental anguish and suffering because, without consent, it exposed their highly intimate and sensitive footage, including deeply personal and financial matters, to unknown human contractors.

203. As a direct and proximate result of Meta's intrusion upon seclusion, Plaintiffs and Class Members have suffered injuries including:

a. invasion of privacy and loss of seclusion;
b. emotional distress, anxiety, humiliation, and other dignitary harms arising from the knowledge that their intimate moments may have been viewed by strangers overseas; and
c. economic injury, including payment of the purchase price and/or a price premium for products that did not conform to Meta's privacy

representations and that functioned as surveillance conduits rather than privacy-protective devices.

204. Meta's conduct was willful, wanton, and in conscious disregard of Plaintiffs' and Class Members' privacy rights, warranting an award of punitive or exemplary damages to the maximum extent allowed by law.

## COUNT V

## FRAUD BY MISREPRESENTATION

**(Brought by all Plaintiffs against Defendants Meta and Luxottica on behalf of the Nationwide Class, or alternatively, the State Subclasses)**

205. Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

206. Plaintiffs bring this claim individually and on behalf of the Nationwide Class, or alternatively, the State Subclasses. This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs and the Class members purchased and/or used the products.

207. Defendants affirmatively misrepresented the capabilities, quality, and nature of the products when selling and marketing them.

208. Defendants also knew that their misrepresentations regarding the products were material, and that a reasonable consumer would rely upon Defendants' representations in making purchasing decisions.

209. Plaintiffs and the Class members did not know—nor could they have discovered through reasonable diligence—the products' true nature.

210. Plaintiffs and the Class members would have been reasonable in relying on Defendants' misrepresentations in making their purchasing decisions.

211. Plaintiffs and the Class members had a right to rely upon Defendants' representations because Defendants maintained monopolistic control over knowledge of the products' true quality.

212. Plaintiffs and the Class members sustained damages as a result of their reliance on Defendants' misrepresentations, thus causing Plaintiffs and the Class members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

**COUNT VI**

**FRAUD BY CONCEALMENT/OMISSION**

**(Brought by all Plaintiffs against Defendants Meta and Luxottica on behalf of the Nationwide Class, or alternatively, the State Subclasses)**

213. Plaintiffs and the Classes incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

214. Plaintiffs bring this claim individually and on behalf of the Nationwide Class, or alternatively, the State Subclasses. This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs and the Class members purchased and/or used the products.

215. Defendants made Material Omissions concerning a presently existing or past fact in that, for example, Defendants did not fully and truthfully disclose to their customers that they would be unable to maintain privacy and control of their data while using the Product, that Defendants would subject consumers' captured data to review and data annotation by subcontractors for the purpose of training Meta's AI model, or that it was impossible to make use of the products' core AI features while avoiding this human review pipeline.

216. These facts, and other facts set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding whether to purchase Defendants' products and similar technology.

217. Defendants had a duty to disclose these omitted facts because speaks, one must speak the whole truth and not conceal any facts that materially qualify the facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

218. Defendants also had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants, who had superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiffs and the Class members. These omitted facts were material because they directly impact the privacy and safety of sensitive consumer data.

219. Defendants were in exclusive control of the material facts, and such facts were not known to the public, Plaintiffs, or the Class members. Defendants also possessed exclusive knowledge of the Material Omissions.

220. Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Class members to purchase the products at a higher price that did not match the products' true value.

221. Plaintiffs and the Class members were unaware of these omitted material facts and would not have acted as they had they known of the concealed and/or suppressed facts. Plaintiffs' and the Class members' actions were justified.

222. Plaintiffs and the Class members reasonably relied on these omissions and concealments and suffered damages as a direct and proximate result, including economic losses (purchase price, price premium, loss of benefit of the bargain), and non-economic harms (invasion of privacy, emotional distress).

223. As a result of these omissions and concealments, Plaintiffs and the Class members incurred damages including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase of the products.

224. As a result of the concealment and/or suppression of the facts, Plaintiffs and the Class members sustained damage. Plaintiffs and the Class members reserve their right to elect to either: (a) rescind their purchase of the products and obtain restitution or (b) affirm their purchase of the products and recover damages.

225. Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Plaintiffs and the Class

members. Defendants' conduct warrants an assessment of punitive damages in a to-be-determined amount sufficient to deter such conduct in the future.

**COUNT VII**

**NEGLIGENT MISREPRESENTATION**

**(Brought by all Plaintiffs against Defendants Meta and Luxottica on behalf of the Nationwide Class, or alternatively, the State Subclasses)**

226. Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

227. Plaintiffs bring this claim individually and on behalf of the Nationwide Class, or alternatively, the State Subclasses. This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs and Class Members purchased and/or used the products.

228. Defendants had a duty to Plaintiffs and the Classes to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, detailing, distribution, and sale of the products.

229. Defendants breached their duty to Plaintiffs and the Classes by advertising the products as having capabilities they do not actually have.

230. Defendants knew or should have known that the qualities and characteristics of the products were not as advertised, marketed, detailed, or otherwise represented or suitable for their intended use and were otherwise not as warranted and represented by Defendants.

231. As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class have suffered actual damages in that they would not have purchased the products had they known that the products do not conform to the Product's marketing, advertising, or statements.

232. Plaintiffs and the Class seek actual damages, attorney's fees, costs, and any other just and proper relief available.

**COUNT VIII**

**BREACH OF CONTRACT**

**(Brought by all Plaintiffs against Defendants Meta and Luxottica on behalf of the Nationwide Class, or alternatively, the State Subclasses)**

233. Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

234. Plaintiffs bring this claim individually and on behalf of the Nationwide Class, or alternatively, the State Subclasses. This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs and Class Members purchased and/or used the products.

235. Defendants expressly warranted that the products would perform as advertised. Defendants' claims regarding the products constituted an affirmation of fact, promise, and/or description of the goods that became part of the basis of the bargain and created an express warranty that the goods would conform to the stated promise. Plaintiffs and the Class Members placed importance on Defendants' claims.

236. Plaintiffs and the Class Members have performed all conditions precedent to Defendants' liability under this contract.

237. Defendants breached the terms of the contract, including the express warranties, with Plaintiffs and the Class Members by not providing products that conform to Defendants' advertising and marketing claims.

238. As a result of Defendants' breach of contract, Plaintiffs and the Class Members have been damaged in the amount to be determined at trial.

**COUNT IX**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

**(Brought by all Plaintiffs against Defendants Meta and Luxottica on behalf of the Nationwide Class, or alternatively, the State Subclasses)**

239. Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

240. Plaintiffs bring this claim individually and on behalf of the Nationwide Class, or alternatively, the State Subclasses. This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs and the Class members purchased and/or used the products.

241. The implied warranty of merchantability provides that, unless excluded or modified, a warranty that a good shall be merchantable is implied in a contract for their sale, if the seller is a merchant with respect to goods of that kind.

242. Defendants are "merchants" with respect to the products at issue.

243. To be merchantable, goods must conform to the promises or affirmations of fact made in the advertising of the product.

244. Defendants breached the implied warranty of merchantability to Plaintiffs and the Classes in their representations that the products were "designed for privacy" and that consumers would be able to maintain privacy and control over their personal data while using the products when this was actually false.

245. As a result of Defendants' misleading conduct, Plaintiffs and the Classes did not receive merchantable goods as impliedly warranted by Defendants.

246. Defendants did not exclude or modify the Product's implied warranty of merchantability.

247. As a proximate result of Defendants' breach of their implied warranty, Plaintiffs and the Classes incurred harm. Plaintiffs and the Classes were injured as a result of Defendants' failure to disclose material facts regarding the products, including that Meta collected user intimate data and transmitted it for analysis by overseas human contractors from outside of the United States without disclosing the nature, scope, and extent of this human review pipeline. Plaintiffs and the Classes paid for a product that did not have the promised quality and nature, paid a premium for the Meta AI Glasses when they could have instead purchased other less expensive glasses or other products, and lost the opportunity to purchase similar products that would not have subjected them to undisclosed collection and sharing of their data.

248. As a result of Defendants' breach of contract, Plaintiffs and the Class Members have been damaged in the amount to be determined at trial.

**<u>COUNT X</u>**

**BREACH OF QUASI-CONTRACT/UNJUST ENRICHMENT**

**(Brought by all Plaintiffs against Defendants Meta and Luxottica on behalf of the Nationwide Class, or alternatively, the State Subclasses)**

249. Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

250. Plaintiffs bring this claim individually and on behalf of the Nationwide Class, or alternatively, the State Subclasses. This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs and Class members purchased and/or used the products.

251. To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

252. Plaintiffs and Class members conferred monetary benefits on Defendants by purchasing the products. Defendants' profits are funded entirely from their generated revenues – payments made by or on behalf of Plaintiffs and Class Members. As such, a portion of these payments was attributable to Defendants' challenged representations and omissions.

253. Defendants knew that Plaintiffs and the Classes conferred a benefit to them, which Defendants accepted, and through which, Defendants were unjustly enriched in retaining the revenues derived from Plaintiffs and Class members' purchases of the products. Retention of those monies under these circumstances is unjust and inequitable because Defendants failed to disclose that, contrary to their representations, the products did not have the technical capabilities they had advertised. These misleading representations caused injuries to Plaintiffs and Class members because they would not have purchased the products if they had been aware of the products' true nature.

254. Defendants enriched themselves by saving the costs they reasonably should have spent on ensuring that the products had the technical capabilities advertised and conformed with their advertised representations and by soliciting purchases from privacy-conscious individuals who would not have purchased the products had they been aware of the products' true nature.

255. Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiffs and Class members is unjust and inequitable, Defendants have been unjustly enriched in an amount to be determined at trial.

**COUNT XI**

**VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW**

**(Cal. Bus. & Prof. Code §§ 17200, *et seq.)***

**(Brought by all Plaintiffs against Defendants Meta and Luxottica on behalf of the Nationwide Class, or alternatively, by Plaintiffs Justin Levian, Noel Flores, and Albert Mejia on behalf of the California Subclass)**

256. Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

257. Plaintiffs bring this claim individually and on behalf of the Nationwide Class, or alternatively, the California Subclass.

258. California Business & Professions Code, §§ 17200, et seq. (the "UCL") prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."

259. Defendants, in their pervasive advertising and marketing of the products, made misleading statements regarding the products' quality and characteristics—specifically, the challenged representations and omissions regarding the data safety and privacy of consumers of the products. Instead, Meta funnels the consumer data, including sensitive videos captured with the products, to be viewed and annotated by

human "data annotators," all so that Meta could use the videos in training Defendants' own AI model.

260. Defendants have no reasonable basis for the challenged representations and omissions made in their advertising because Defendants did not maintain consumers' data privacy. Thus, the products fail—as Defendants directed and intended—to deliver the advertised functionality for everyday use and during various activities. Defendants knew (and know) that they do not maintain the privacy of consumer data captured by the products, posing a misrepresentation of their functionality, yet intentionally advertised and marketed the products to deceive reasonable consumers and continue to do so presently.

261. Defendants' advertising and marketing of the products led, and continues to lead, reasonable consumers, including Plaintiffs and Class members, to believe that they would be able to maintain the privacy and control of their data while using the products as Defendants advertised.

262. Plaintiffs and the Class members have suffered injury in fact and have lost money or property as a result of and in reliance on the challenged representations and omissions—namely, Plaintiffs and the Class members lost at least the value of purchase price for the products they bought from the Defendants.

263. Defendants' conduct, as alleged herein, constitutes unfair, unlawful, and fraudulent business practices pursuant to the UCL. The UCL prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising." Cal. Bus & Prof. Code § 17200. In addition, Defendants' use of various forms of advertising media to advertise, call attention to, or give publicity to the sale of goods or merchandise that are not as represented in any manner constitutes unfair competition, unfair, deceptive, untrue or misleading advertising, and an unlawful business practice within the meaning of Business and Professions

Code §§ 17200 and 17531 that have deceived and are likely to further deceive the consuming public, in violation of Business and Professions Code § 17200.

264. Defendants failed to avail themselves of lawful, reasonably available, alternatives to further their legitimate business interests.

265. All of the conduct alleged herein occurred and continues to occur in Defendants' businesses. Defendants' wrongful conduct is part of a pattern, practice and/or generalized course of conduct, which will continue on a daily basis until Defendants voluntarily alter their conduct or are ordered to do so.

266. Pursuant to Business and Professions Code §§ 17203 & 17535, Plaintiffs and the Class members seek an order from this Court enjoining Defendants from continuing to engage in, use, or employ their practices of false and deceptive advertising and marketing of the products. Likewise, Plaintiffs and the Class members seek an order requiring Defendants to disclose such misrepresentations, thus precluding Defendants' failure to disclose the existence and significance of said misrepresentations.

267. As a direct and proximate result of Defendants' misconduct in violation of the UCL, Plaintiffs and the Class members were harmed in the amount of the purchase price they paid for the products. Further, Plaintiffs and the Class members have suffered and continue to suffer economic losses and other damages, including, but not limited to, the amounts paid for the products and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs seek a monetary award for violation of the UCL in damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiffs and the Class members for said monies, as well as injunctive relief to enjoin Defendants' misconduct to prevent ongoing and future harm that will result.

***"Unfair" Prong***

268. Under the UCL, a challenged activity is "unfair" when "any injury it causes outweighs any benefits provided to consumers and the injury is one that the consumers themselves could not reasonably avoid."

269. Defendants' action of falsely advertising the products with the challenged representations and omissions encouraged consumers to purchase the products with the expectation that they would, as advertised, maintain privacy and control over their data while using the products. But the consumer data is not kept private or protected as advertised.

270. This deception causes financial injuries to consumers, who do not receive products commensurate with their reasonable expectations, overpay for the products, and receive products of lesser standards than what they reasonably expected to receive. Consumers cannot avoid any of the injuries caused by Defendants' deceptive advertising and marketing of the products because they had no way to know that Defendants were deceiving them. Accordingly, the injuries caused by Defendants' deceptive advertising and marketing outweigh any purported benefits.

271. Some courts conduct a balancing test to decide if a challenged activity amounts to unfair conduct under California Business and Professions Code § 17200, in which they weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim.

272. Here, Defendants' conduct—falsely advertising that consumers' data privacy would be protected while using the products despite collecting data beyond the scope of what consumers had consented to and subjecting all of the collected data to human review in unfiltered or inadequately filtered form—results in financial harm to consumers. Thus, the utility of Defendants' conduct is vastly outweighed by the gravity of the harm.

273. Some courts require that unfairness be tethered to some legislative declared policy or proof of some actual or threatened impact on competition.

274. Defendants' advertising and marketing of the products, as alleged herein, is deceptive, misleading, and unreasonable, and it constitutes unfair conduct. Defendants knew or should have known of their unfair conduct. Defendants' misrepresentations constitute an unfair business practice within the meaning of California Business and Professions Code § 17200.

275. There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein. Defendants easily could have refrained from labeling the products with the challenged representations and omissions.

276. All of the conduct alleged herein occurs and continues to occur in Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct repeated (at least) thousands of times per day.

277. Pursuant to Business and Professions Code § 17203, Plaintiffs and the Classes seek an order of this Court enjoining Defendants from continuing to engage in, use, or employ their practices of advertising and marketing the products with the challenged representations and omissions.

278. Plaintiffs and the Class members have suffered injuries in fact, have lost money and purchased an inferior product as a result of Defendants' unfair conduct. Plaintiffs and the Class members paid an unwarranted premium for these products. Specifically, Plaintiffs and the Class members paid for products that were advertised as maintaining consumers' privacy and control over data. Had Plaintiffs and the Class members known that the products' advertising and marketing were deceptive, they would not have purchased—or would have paid substantially less for—the products. Accordingly, Plaintiffs seek restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

***<u>"Fraudulent" Prong</u>***

279. The UCL considers conduct fraudulent (and prohibits said conduct) if it is likely to deceive members of the public.

280. Defendants used the challenged representations and omissions with the intent to sell the products to consumers, including Plaintiffs and the Class members. The challenged representations and omissions are deceptive, and Defendants knew, or should have known, of their deception. The challenged representations and omissions are likely to mislead consumers into purchasing the products because they are material to the average, ordinary, and reasonable consumer.

281. As alleged herein, the misrepresentations by Defendants constitute a fraudulent business practice in violation of California Business & Professions Code § 17200.

282. Plaintiffs and the Class members reasonably and detrimentally relied on the material and deceptive challenged representations and omissions to their detriment in that they purchased the products.

283. Defendants had and continue to have lawful, reasonably available alternatives to further their legitimate business interests other than the conduct described herein. Defendants could have refrained from labeling the products with the challenged representations and omissions.

284. Defendants' wrongful conduct is part of a pattern or generalized course of conduct.

285. Pursuant to Business and Professions Code § 17203, Plaintiffs and the Class members seek an order of this Court enjoining Defendants from continuing to engage, use, or employ their practice of advertising and marketing the products with the challenged representations and omissions.

286. Plaintiffs and the Class members have suffered injury in fact and have lost money as a result of Defendants' fraudulent conduct. Plaintiffs paid an unwarranted premium for the products. Specifically, Plaintiffs and the Class members paid for and/or used products for which Defendants advertised that, in using those products, consumers would maintain privacy and control over their personal data. Instead, Defendants used consumers' captured data in unfiltered or inadequately

filtered form for human review by subcontractors and for training of Meta's AI models. Accordingly, Plaintiffs seek damages, restitution, and/or disgorgement of ill-gotten gains pursuant to the UCL.

***"Unlawful" Prong***

287. The UCL identifies violations of other laws as "unlawful practices that the unfair competition law makes independently actionable."

288. Defendants' advertising and marketing of the products, as alleged herein, violates California Civil Code sections 1750, et seq. (the "CLRA") and California Business and Professions Code sections 17500, et seq. (the "FAL") as set forth below in the sections regarding those causes of action.

289. Additionally, Defendants' use of the Challenged Misrepresentations and omissions to sell the products violates California Civil Code §§ 1572 (actual fraud), 1573 (constructive fraud), 1709–10 (fraudulent deceit), & 1711 (deceit upon the public), as set forth above.

290. Defendants' conduct in making the deceptive representations described herein constitutes a knowing failure to adopt policies in accordance with and/or adherence to applicable laws, as set forth herein, all of which are binding upon and burdensome to their competitors. This conduct engenders an unfair competitive advantage for Defendants, thereby constituting an unfair, fraudulent, and/or unlawful business practice under California Business & Professions Code §§ 17200–08. Additionally, Defendants' misrepresentations of material facts, as set forth herein, violate California Civil Code §§ 1572, 1573, 1709, 1710, 1711, & 1770, as well as the common law claims stated in this lawsuit.

291. Defendants' advertising and marketing of the products, as alleged herein, are deceptive, misleading, and unreasonable, and constitute unlawful conduct. Defendants knew or should have known that their conduct was unlawful.

292. Defendants had reasonably available alternatives to further their legitimate business interests, other than the conduct described herein. Defendants

could have refrained from advertising the products with the challenged representations and omissions.

293. All of the conduct alleged herein occurs and continues to occur in Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct.

294. Pursuant to Business and Professions Code Section 17203, Plaintiffs and the Class members seek an order of this Court enjoining Defendants from continuing to engage in, use, or employ their practice of deceptive advertising of the products.

295. Plaintiffs and the Class members have suffered injury in fact and have lost money as a result of Defendants' unlawful conduct. Plaintiffs and the Class members paid an unwarranted premium for the products and/or entrusted Defendants with their valuable personal data under false pretenses. Plaintiffs and the Class members would not have purchased or used the products if they had known about the Challenged Omissions and Misrepresentations. Accordingly, Plaintiffs seek restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

## COUNT XII

## CALIFORNIA FALSE ADVERTISING LAW

**(Cal. Bus. & Prof. Code §§ 17500, *et seq.*)**

**(Brought by all Plaintiffs against Defendants Meta and Luxottica on behalf of the Nationwide Class, or alternatively, by Plaintiffs Justin Levian, Noel Flores, and Albert Mejia on behalf of the California Subclass)**

296. Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

297. Plaintiffs bring this claim individually and on behalf of the Nationwide Class, or alternatively, the California Subclass.

298. The False Advertising Law ("FAL"), codified at Cal. Bus. & Prof. Code § 17500, et seq., prohibits "unfair, deceptive, untrue or misleading advertising[.]"

299. Defendants violated § 17500 when they advertised and marketed the products through the unfair, deceptive, and misleading challenged representations and omissions disseminated to the public through the products' advertising and marketing. These representations were deceptive because the products do not conform to them. The representations were material because they are likely to mislead a reasonable consumer into purchasing the products.

300. In making and disseminating the challenged representations and omissions alleged herein, Defendants knew or should have known that the representations were untrue or misleading, and acted in violation of § 17500.

301. Defendants' challenged representations and omissions were specifically designed to induce reasonable consumers, like Plaintiffs and the Class members, to purchase the products.

302. As a direct and proximate result of Defendants' misconduct in violation of the FAL, Plaintiffs and the Class members were harmed in the amount of the purchase price they paid for the products and/or the value of the personal information with which they entrusted Defendants. Further, Plaintiffs and the Class members have suffered and continue to suffer economic losses and other damages, including, but not limited to, the amounts paid for the products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs seek a monetary award for violation of the FAL in damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiffs and the Class members for said monies, as well as injunctive relief to enjoin Defendants' misconduct to prevent ongoing and future harm that will result, as well as a corrective advertising campaign to correct prior misrepresentations and corrective notice to all purchasers and/or users of the products.

## COUNT XIII

## CALIFORNIA CONSUMERS LEGAL REMEDIES ACT

## (Cal. Civ. Code §§ 1750, *et seq.*)

**(Brought by all Plaintiffs against Defendants Meta and Luxottica on behalf of the Nationwide Class, or alternatively, by Plaintiffs Justin Levian, Noel Flores, and Albert Mejia on behalf of the California Subclass)**

303. Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

304. Plaintiffs bring this claim individually and on behalf of the Nationwide Class, or alternatively, the California Subclass.

305. The California Consumers Legal Remedies Act ("CLRA") provides that "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful."

306. The products are "goods" as defined by the CLRA in California Civil Code §1761(a) because they are tangible objects that Plaintiffs and the Classes purchased primarily for personal, family, or household purposes.

307. Defendants are "persons" as defined by the CLRA in California Civil Code §1761(c) because they are corporations.

308. Plaintiffs and Class members are "consumers" as defined by the CLRA in California Civil Code §1761(d) because they are individuals who purchased the products for personal, family, or household purposes.

309. The purchases of the products by Plaintiffs and the Class members are "transactions" as defined by the CLRA under California Civil Code section 1761(e) because Plaintiffs and the Class members entered into agreements with Defendants or their authorized vendors to purchase the products.

310. Defendants violated the following sections of the CLRA by selling the products to Plaintiffs and the Classes through the misleading, deceptive, and fraudulent challenged representations and omissions:

a. Section 1770(a)(5) by representing that the products have "characteristics, . . . uses [or] benefits . . . which they do not have."

b. Section 1770(a)(7) by representing that the products "are of a particular standard, quality, or grade . . . when they are of another."

c. Section 1770(a)(9) by advertising the products "with [the] intent not to sell [] as advertised."

311. Defendants' uniform and material representations and omissions regarding the products were likely to deceive, and Defendants knew or should have known that their challenged representations and omissions were misleading.

312. Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally misled and withheld material information from consumers, including Plaintiffs, to increase the sale of the products.

313. Plaintiffs and Class members could not have reasonably avoided such injury. Plaintiffs and the Class members were unaware of the existence of the facts that Defendants suppressed and failed to disclose, and Plaintiffs and the Class members would not have purchased the products and/or would have purchased them on different terms had they known the truth.

314. Plaintiffs and the Class members suffered harm as a result of Defendants' violations of the CLRA because they relied on the challenged representations and omissions in deciding to purchase the products. The challenged representations and omissions were a substantial factor. The challenged representations and omissions were material because a reasonable consumer would consider it important in deciding whether to purchase the products.

315. As a direct and proximate result of Defendants' misconduct in violation of the CLRA, Plaintiffs and the Class members were harmed in the amount of the purchase price they paid for the products. Accordingly, Plaintiffs seek a monetary award for violation of this Act in the form of restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiffs and the Class members for said monies.

316. Pursuant to Section 1780(a) of the Act, Plaintiffs seek injunctive relief in the form of an order enjoining the above-described wrongful acts and practices of

Defendants, including, but not limited to, an order enjoining Defendants from continuing to make the misleading claims and omissions challenged herein and requiring Defendants to undertake a corrective advertising campaign to correct their prior false and misleading representations. Plaintiffs also request a court order requiring Defendants to provide restitution to Plaintiffs and the Class for the money wrongfully acquired. Unless this injunctive relief is granted, Plaintiffs will suffer irreparable harm.

317. Plaintiffs respectfully request that the Court enjoin Defendants from continuing to employ the unlawful methods, acts, and practices alleged herein pursuant to § 1780(a)(2). In addition, Defendants should be compelled to provide restitution to consumers who paid for products that are not what they expected to receive due to Defendants' misrepresentations.

318. Plaintiffs and Class members are entitled to equitable relief because no adequate remedy at law exists.

319. Injunctive relief is appropriate on behalf of Plaintiffs and the Class members because Defendants have failed to make the Challenged Omissions clear—i.e., that consumers cannot maintain privacy or control over their personal data while using the products. Injunctive relief is necessary to correct past harm and prevent future harm—none of which can be achieved through available legal remedies. Further, injunctive relief in the form of advertising or marketing modifications as well as a corrective advertising campaign and targeted corrective notices is necessary to dispel public misperception about the products that has resulted from Defendants' unfair, fraudulent, and unlawful marketing efforts. Such modifications would include maintaining consumer data privacy as advertised, or making clear to consumers that they will not be able to maintain privacy and control over their personal data. Such relief is also not available through a legal remedy because, while monetary damages may be awarded to remedy past harm (i.e., purchasers who have been misled), injunctive relief is necessary to remedy future harm (i.e., prevent future purchasers

from being misled), under the current circumstances where the dollar amount of future damages is not reasonably ascertainable at this time. Plaintiffs are, currently, unable to accurately quantify the damages caused by Defendants' future harm (e.g., the dollar amount that Plaintiffs and Class members overpay for the products), rendering injunctive relief a necessary remedy.

**COUNT XIV**

**FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**

**(Fla. Stat. §§ 501.201, *et seq.*)**

**(Brought by Plaintiff Natasha Gauvin against Defendants Meta and Luxottica on behalf of the Florida Subclass)**

320. Plaintiff Natasha Gauvin ("Plaintiff," for purposes of this Count), restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

321. Plaintiff brings this claim individually and on behalf of the Florida Subclass.

322. The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") declares unlawful unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce.

323. Defendants advertised, offered, or sold goods or services in Florida and engaged in trade or commerce directly or indirectly affecting the people of Florida. Defendants engaged in unfair or deceptive acts or practices in trade or commerce by:

a. representing that the products were "designed for privacy, controlled by you," "built for your privacy," and similar statements;

b. representing that the products would maintain the privacy and security of users' data; and

c. omitting, suppressing, and concealing the material facts that the products transmit intimate footage to Meta's servers and expose that

footage to human annotators overseas, including highly sensitive bathroom, bedroom, sexual, and financial content.

324. Defendants' unfair or deceptive acts and practices were likely to—and did— mislead reasonable consumers acting reasonably under the circumstances, including Plaintiff and Florida Subclass Members.

325. As a direct and proximate result of Defendants' violations of FDUTPA, Plaintiff and Florida Subclass Members suffered actual damages, including:

a. payment of the purchase price and/or a price premium for the products;

b. loss of the benefit of their bargain; and

c. non-economic harms, including loss of privacy and dignitary harms from exposure of intimate footage to human annotators.

326. Plaintiff and Florida Subclass Members would not have purchased the products, or would have paid significantly less, had Defendants disclosed the true nature of the products' privacy practices.

327. Plaintiff and Florida Subclass Members seek actual damages, declaratory relief, injunctive relief, and an award of reasonable attorneys' fees and costs as permitted under the FDUTPA.

## COUNT XV

## ILLINOIS CONSUMER FRAUD ACT

**(815 Ill. Comp. Stat. §§ 505/1, *et seq.*)**

**(Brought by Plaintiff Antonio Enriquez against Defendants Meta and Luxottica on behalf of the Illinois Subclass)**

328. Plaintiff Antonio Enriquez ("Plaintiff," for purposes of this Count), restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

329. Plaintiff brings this claim individually and on behalf of the Illinois Subclass.

330. Defendants are "persons" as defined by 815 Ill. Comp. Stat. §§ 505/1(c).

331. Plaintiff and Illinois Subclass members are "consumers" as defined by 815 Ill. Comp. Stat. §§ 505/1(e).

332. Defendants' conduct as described herein was in the conduct of "trade" or "commerce" as defined by 815 Ill. Comp. Stat. § 505/1(f).

333. Defendants' deceptive, unfair, and unlawful trade acts or practices, in violation of 815 Ill. Comp. Stat. § 505/2, include:

a. representing that the products were "designed for privacy, controlled by you," "built for your privacy," and similar statements;

b. representing that the products would maintain the privacy and security of users' data; and

c. omitting, suppressing, and concealing the material facts that the products transmit intimate footage to Meta's servers and expose that footage to human annotators overseas, including highly sensitive bathroom, bedroom, sexual, and financial content.

334. Defendants' representations and omissions were material because they were likely to and did deceive Plaintiff and Illinois Subclass members about the products' true nature and the nature, scope, and extent of the human review pipeline.

335. Defendants intended to mislead Plaintiff and Illinois Subclass members and induce them to rely on Defendants' misrepresentations and omissions.

336. Defendants' above-described representations and omissions were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury that these consumers could not reasonably avoid; this substantial injury outweighed any purported benefits to consumers or to competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Illinois Subclass Members suffered actual damages, including:

a. payment of the purchase price and/or price premium;

b. loss of the benefit of their bargain; and

c. privacy and dignitary harms associated with exposure of intimate footage to human annotators.

337. Plaintiff and Illinois Subclass members seek all monetary and non-monetary relief allowed by law, including damages, restitution, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

**COUNT XVI**

**ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT**

**815 Ill. Comp. Stat. §§ 510/2, *et seq.***

**(Brought by Plaintiff Antonio Enriquez against Defendants Meta and Luxottica on behalf of the Illinois Subclass)**

338. Plaintiff Antonio Enriquez ("Plaintiff," for purposes of this Count), restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

339. Plaintiff brings this claim individually and on behalf of the Illinois Subclass.

340. Defendants engaged in deceptive trade practices in the conduct of their business in violation of 815 Ill. Comp. Stat. §§ 510/2(a), including:

a. Representing that goods or services have characteristics that they do not have;

b. Representing that goods or services are of a particular standard, quality, or grade if they are of another;

c. Advertising goods or services with intent not to sell them as advertised; and

d. Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

341. Defendants' deceptive trade practices include:

a. advertising and marketing the products as "designed for privacy, controlled by you," "built for your privacy," and similar statements conveying robust privacy protections;

b. representing that consumers' data would remain private and under their control when using the products; and

c. omitting, suppressing, concealing, and failing to disclose the material facts that: (1) intimate footage, including bathroom visits, sex, nudity, and financial information, would be transmitted to Meta's servers and viewed and annotated by human contractors overseas for in Meta's AI training pipeline, and (2) users who wished to make use of the products' core AI features could not opt out of the human review pipeline.

342. Defendants' representations and omissions were material because they were likely to and did deceive Plaintiff and Illinois Subclass members about the products' true nature and the nature, scope, and extent of the human review pipeline.

343. Defendants intended to mislead Plaintiff and Illinois Subclass members and induce them to rely on Defendants' misrepresentations and omissions.

344. Defendants' above-described unfair and deceptive practices and acts were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury that these consumers could not reasonably avoid; this substantial injury outweighed any purported benefits to consumers or to competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Illinois Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including:

a. payment of the purchase price and/or price premium;

b. loss of the benefit of their bargain; and

c. privacy and dignitary harms associated with exposure of intimate footage to human annotators.

345. Plaintiff and Illinois Subclass members seek all monetary and non-monetary relief allowed by law, including damages, restitution, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

**COUNT XVII**

**MASSACHUSETTS CONSUMER PROTECTION ACT**

**Mass. Gen. Laws Ann. Ch. 93A, §§ 1, *et seq.***

**(Brought by Plaintiff Samridh Chhetri against Defendants Meta and Luxottica on behalf of the Massachusetts Subclass)**

346. Plaintiff Samridh Chhetri ("Plaintiff," for purposes of this Count), restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

347. Plaintiff brings this claim individually and on behalf of the Massachusetts Subclass.

348. Plaintiff, Massachusetts Subclass members, and Defendants are "persons" as meant by Mass. Gen. Laws. Ann. ch. 93A, § 1(a).

349. Defendants operate in "trade or commerce" as meant by Mass. Gen. Laws Ann. ch. 93A, § 1(b).

350. Defendants engaged in unfair methods of competition and unfair and deceptive acts and practices in the conduct of trade or commerce in violation of Mass. Gen. Laws Ann. ch. 93A, § 2(a), including:

a. advertising and marketing the products as "designed for privacy, controlled by you," "built for your privacy," and similar statements conveying robust privacy protections;

b. representing that consumers' data would remain private and under their control when using the products; and

c. omitting, suppressing, concealing, and failing to disclose the material facts that: (1) intimate footage, including bathroom visits, sex, nudity, and financial information, would be transmitted to Meta's servers and

viewed and annotated by human contractors overseas for in Meta's AI training pipeline, and (2) users who wished to make use of the products' core AI features could not opt out of the human review pipeline.

351. Defendants' representations and omissions were material because they were likely to and did deceive Plaintiff and Massachusetts Subclass members about the products' true nature and the nature, scope, and extent of the human review pipeline.

352. Defendants intended to mislead Plaintiff and Massachusetts Subclass members and induce them to rely on Defendants' misrepresentations and omissions. Defendants' above-described unfair and deceptive practices and acts were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury that these consumers could not reasonably avoid; this substantial injury outweighed any purported benefits to consumers or to competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Massachusetts Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including:

a. payment of the purchase price and/or price premium;
b. loss of the benefit of their bargain; and
c. privacy and dignitary harms associated with exposure of intimate footage to human annotators.

353. Plaintiffs and Massachusetts Subclass Members provided or will provide the written demand for relief required by Mass. Gen. Laws ch. 93A, § 9(3), and Defendants failed to make a reasonable tender of settlement in response.

354. Plaintiffs and Massachusetts Subclass Members seek all relief available under ch. 93A, including actual or statutory damages, double or treble damages for willful or knowing violations, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT XVIII

## MICHIGAN CONSUMER PROTECTION ACT

## (Mich. Comp. Laws Ann. §§ 445.903, *et seq.*)

## (Brought by Plaintiff Selina Dallas against Defendants Meta and Luxottica on behalf of the Michigan Subclass)

355. Plaintiff Selina Dallas ("Plaintiff," for purposes of this Count), restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

356. Plaintiff brings this claim individually and on behalf of the Michigan Subclass.

357. Plaintiff, Michigan Subclass members, and Defendants are "persons" as defined by Mich. Comp. Laws Ann. § 445.903(d).

358. Defendants advertised, offered, or sold goods or services in Michigan and engaged in trade or commerce directly or indirectly affecting the people of Michigan, as defined by Mich. Comp. Laws Ann. § 445.903(g).

. Defendants engaged in unfair, unconscionable, and deceptive practices in the conduct of trade and commerce in violation of Mich. Comp. Laws Ann. § 445.903(1), including:

a. Representing that their goods and services have characteristics, uses, and benefits that they do not have, in violation of Mich. Comp. Laws Ann. § 445.903(1)(c);

b. Representing that their goods and services are of a particular standard or quality if they are of another, in violation of Mich. Comp. Laws Ann. § 445.903(1)(e);

c. Making a representation or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is, in violation of Mich. Comp. Laws Ann. § 445.903(1)(bb); and

d. Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive matter, in violation of Mich. Comp. Laws Ann. § 445.903(1)(cc).

359. Defendants' unfair, unconscionable, and deceptive practices include:

a. advertising and marketing the products as "designed for privacy, controlled by you," "built for your privacy," and similar statements conveying robust privacy protections;

b. representing that consumers' data would remain private and under their control when using the products; and

c. omitting, suppressing, concealing, and failing to disclose the material facts that: (1) intimate footage, including bathroom visits, sex, nudity, and financial information, would be transmitted to Meta's servers and viewed and annotated by human contractors overseas for in Meta's AI training pipeline, and (2) users who wished to make use of the products' core AI features could not opt out of the human review pipeline.

360. Defendants intended to mislead Plaintiff and Michigan Subclass members and induce them to rely on their misrepresentations and omissions. Defendants acted intentionally, knowingly, and maliciously to violate Michigan's Consumer Protection Act and recklessly disregarded Plaintiff's and Michigan Subclass members' rights.

361. Defendants' misrepresentations and omissions were material because they were likely to—and did—deceive Plaintiff and Michigan Subclass Members about the true nature of the products' privacy practices and the existence, nature, scope, and extent, of a human review pipeline, factors that would be important to a reasonable consumer in deciding whether to purchase the products and at what price. Defendants' above-described unfair and deceptive practices and acts were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury that

these consumers could not reasonably avoid; this substantial injury outweighed any purported benefits to consumers or to competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Michigan Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including:

a. payment of the purchase price and/or price premium;
b. loss of the benefit of their bargain; and
c. privacy and dignitary harms associated with exposure of intimate footage to human annotators.

362. Plaintiffs and Michigan Subclass members seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or statutory damages in the amount of $250 for each Michigan Subclass member, restitution, injunctive relief, and any other relief that is just and proper.

## COUNT XX

## MISSISSIPPI CONSUMER PROTECTION ACT

**(Miss. Code Ann. §§ 75-24-1, *et seq.*)**

**(Brought by Plaintiff Aaliyah Ross against Defendants Meta and Luxottica on behalf of the Michigan Subclass)**

363. Plaintiff Aaliyah Ross ("Plaintiff," for purposes of this Count), restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

364. Plaintiff brings this claim individually and on behalf of the Mississippi Subclass.

365. Defendants are "persons" as defined by Miss. Code § 75-24-3.

366. Defendants advertised, offered, or sold goods or services in Mississippi and engaged in trade or commerce directly or indirectly affecting the people of Mississippi, as defined by Miss. Code § 75-24-3.

367. Defendants engaged in unfair and deceptive trade acts or practices, including:

a. advertising and marketing the products as "designed for privacy, controlled by you," "built for your privacy," and similar statements conveying robust privacy protections;

b. representing that consumers' data would remain private and under their control when using the products; and

c. omitting, suppressing, concealing, and failing to disclose the material facts that: (1) intimate footage, including bathroom visits, sex, nudity, and financial information, would be transmitted to Meta's servers and viewed and annotated by human contractors overseas for in Meta's AI training pipeline, and (2) users who wished to make use of the products' core AI features could not opt out of the human review pipeline.

368. The above-described conduct violated Miss. Code Ann. § 75-24-5(2), including:

a. Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have;

b. Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

c. Advertising goods or services with intent not to sell them as advertised.

369. Defendants intended to mislead Plaintiffs and Michigan Subclass members and induce them to rely on their misrepresentations and omissions.

370. Defendants' acts and practices were material because they were likely to mislead reasonable consumers and did mislead Plaintiff and Mississippi Subclass Members.

371. Plaintiff and Mississippi Subclass Members would not have purchased the products, or would have paid significantly less, had Defendants disclosed the true nature of the products' privacy practices.

372. Defendants' above-described unfair and deceptive practices and acts were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury that these consumers could not reasonably avoid; this substantial injury outweighed any purported benefits to consumers or to competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Mississippi Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including:

a. payment of the purchase price and/or price premium;
b. loss of the benefit of their bargain; and
c. privacy and dignitary harms associated with exposure of intimate footage to human annotators.

373. Defendants' violations present a continuing risk to Plaintiff and Mississippi Subclass members as well as to the general public.

374. Plaintiff and Mississippi Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, restitution and other relief under Miss. Code § 75-24-11, injunctive relief, punitive damages, and reasonable attorneys' fees and costs.

**<u>COUNT XXI</u>**

**NEW YORK GENERAL BUSINESS LAW**

**(N.Y. Gen. Bus. Law §§ 349, *et seq.*)**

**(Brought by Plaintiff Mohammad Supiro against Defendants Meta and uxottica on behalf of the New York Subclass)**

375. Plaintiff Mohammad Suprio ("Plaintiff," for purposes of this Count), restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

376. Plaintiff brings this claim individually and on behalf of the New York Subclass.

377. Defendants engaged in deceptive acts or practices in the conduct of their business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349, including:

a. advertising and marketing the products as "designed for privacy, controlled by you," "built for your privacy," and similar statements conveying robust privacy protections;

b. representing that consumers' data would remain private and under their control when using the products; and

c. omitting, suppressing, concealing, and failing to disclose the material facts that: (1) intimate footage, including bathroom visits, sex, nudity, and financial information, would be transmitted to Meta's servers and viewed and annotated by human contractors overseas for in Meta's AI training pipeline, and (2) users who wished to make use of the products' core AI features could not opt out of the human review pipeline.

378. Plaintiff and New York Subclass members were deceived in New York. They also transacted with Defendants in New York by using Defendants' products in New York.

379. Defendants' representations and omissions were material because they were likely to deceive Plaintiff and New York Subclass Members about the true nature of the products' privacy practices and the existence, nature, scope, and extent, of a human review pipeline, factors that would be important to a reasonable consumer in deciding whether to purchase the products and at what price.

380. Defendants acted intentionally, knowingly, and maliciously to violate New York's General Business Law and recklessly disregarded Plaintiff's and New York Subclass members' rights.

381. Plaintiff and New York Subclass Members would not have purchased the products, or would have paid less, had Defendants disclosed the true nature of the products' privacy practices and human review pipeline.

382. Defendants' above-described unfair and deceptive practices and acts were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury that these consumers could not reasonably avoid; this substantial injury outweighed any purported benefits to consumers or to competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and New York Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including:

a. payment of the purchase price and/or price premium;

b. loss of the benefit of their bargain; and

c. privacy and dignitary harms associated with exposure of intimate footage to human annotators.

383. Defendants' deceptive and unlawful acts and practices complained of herein affected the public interest and consumers at large, including the (at least) thousands of New Yorkers—both users and bystanders—whose intimate information was nonconsensually shared with unknown overseas contractors. Defendants' above-described deceptive and unlawful practices and acts caused substantial injury to Plaintiff and New York Subclass members that they could not reasonably avoid.

384. Plaintiffs and New York Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50 (whichever is greater), treble damages, restitution, injunctive relief, and attorney's fees and costs.

**<u>COUNT XXII</u>**

**OHIO CONSUMER SALES PRACTICES ACT**

**(Ohio Rev. Code §§ 1345.01, *et seq.*)**

**(Brought by Plaintiff Nathaniel Marrufo against Defendants Meta and Luxottica on behalf of the Ohio Subclass)**

385. Plaintiff Nathaniel Marrufo ("Plaintiff," for purposes of this Count), restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

386. Plaintiff brings this claim individually and on behalf of the Ohio Subclass.

387. Plaintiff, Ohio Subclass members, and Defendants are "persons" as defined by Ohio Rev. Code § 1345.01(B).

388. Defendants are "suppliers" and Plaintiff and Ohio Subclass members are "consumers," both respectively engaged in "consumer transactions" as defined by Ohio Rev. Code §§ 1345.01(A) & (C).

389. Defendants engaged in unfair and deceptive acts and practices in connection with a consumer transaction in violation of Ohio Rev. Code §§ 1345.02, including:

a. representing that their goods, services, and intangibles had performance characteristics, uses, and benefits that it did not have, in violation of Ohio Rev. Code § 1345.02(B)(1); and

b. representing that their goods, services, and intangibles were of a particular standard or quality when they were not, in violation of Ohio Rev. Code § 1345(B)(2).

390. Defendants engaged in unconscionable acts and practices in connection with a consumer transaction, in violation of Ohio Rev. Code Ann. § 1345.03, including:

a. knowingly taking advantage of Plaintiff's and Ohio Subclass members' inability to reasonably protect their interests because of their ignorance of the issues discussed herein (Ohio Rev. Code Ann. § 1345.03(B)(1)); and

b. requiring Plaintiff and Ohio Subclass members to enter into a consumer transaction on terms that Defendants knew were substantially one-sided in favor of themselves (Ohio Rev. Code Ann. § 1345.03(B)(5)).

391. Defendants' unfair, deceptive, and unconscionable acts and practices include:

a. advertising and marketing the products as "designed for privacy, controlled by you," "built for your privacy," and similar statements conveying robust privacy protections;

b. representing that consumers' data would remain private and under their control when using the products; and

c. omitting, suppressing, concealing, and failing to disclose the material facts that: (1) intimate footage, including bathroom visits, sex, nudity, and financial information, would be transmitted to Meta's servers and viewed and annotated by human contractors overseas for in Meta's AI training pipeline, and (2) users who wished to make use of the products' core AI features could not opt out of the human review pipeline.

392. Defendants' representations and omissions were material because they were likely to—and did—deceive Plaintiff and Ohio Subclass Members about the true nature of the products' privacy practices and the existence, nature, scope, and extent, of a human review pipeline, factors that would be important to a reasonable consumer in deciding whether to purchase the products and at what price.

393. Defendants acted intentionally, knowingly, and maliciously to Ohio's Consumer Sales Practices Act and recklessly disregarded Plaintiff's and Ohio Subclass members' rights.

394. Plaintiff and Ohio Subclass Members would not have purchased the products, or would have paid less, had Defendants disclosed the true nature of the products' privacy practices and human review pipeline.

395. Defendants' deceptive and unlawful acts and practices complained of herein affected the public interest, including the many Ohioans—both users and bystanders—whose intimate information was, without consent, shared with unknown overseas contractors.

396. Defendants' above-described unfair and deceptive practices and acts were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury that these consumers could not reasonably avoid; this substantial injury outweighed any purported benefits to consumers or to competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Ohio Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including:

a. payment of the purchase price and/or price premium;
b. loss of the benefit of their bargain; and
c. privacy and dignitary harms associated with exposure of intimate footage to human annotators.

397. Plaintiff and Ohio Subclass members seek all monetary and non-monetary relief allowed by law, including declaratory and injunctive relief, the greater of actual and treble damages or statutory damages, attorneys' fees and costs, and any other appropriate relief.

**COUNT XXIV**

**OHIO DECEPTIVE TRADE PRACTICES ACT**

**(Ohio Rev. Code §§ 4165.01, *et seq.*)**

**(Brought by Plaintiff Nathaniel Marrufo against Defendants Meta and Luxottica on behalf of the Ohio Subclass)**

398. Plaintiff Nathaniel Marrufo ("Plaintiff," for purposes of this Count), restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

399. Plaintiff brings this claim individually and on behalf of the Ohio Subclass.

400. Plaintiff, Ohio Subclass members, and Defendants are "persons" as defined by Ohio Rev. Code § 1345.01(B).

401. Defendants, Plaintiffs, and Ohio Subclass members are "persons" as defined by Ohio Rev. Code § 4165.01(D).

402. Defendants advertised, offered, or sold goods or services in Ohio and engaged in trade or commerce directly or indirectly affecting the people of Ohio.

403. Defendants engaged in deceptive trade practices in the course of their business and vocation in violation of Ohio Rev. Code § 4165.02, including:

a. Representing that their goods and services have characteristics, uses, benefits, or qualities that they do not have, in violation of Ohio Rev. Code § 4165.02(A)(7);

b. Representing that their goods and services are of a particular standard or quality when they are of another, in violation of Ohio Rev. Code § 4165.02(A)(9); and

c. Advertising their goods and services with intent not to sell them as advertised, in violation of Ohio Rev. Code § 4165.02(A)(11).

404. Defendants' deceptive trade practices include:

a. advertising and marketing the products as "designed for privacy, controlled by you," "built for your privacy," and similar statements conveying robust privacy protections;

b. representing that consumers' data would remain private and under their control when using the products; and

c. omitting, suppressing, concealing, and failing to disclose the material facts that: (1) intimate footage, including bathroom visits, sex, nudity, and financial information, would be transmitted to Meta's servers and viewed and annotated by human contractors overseas for in Meta's AI training pipeline, and (2) users who wished to make use of the products' core AI features could not opt out of the human review pipeline.

405. Defendants intended to mislead Plaintiff and Ohio Subclass members and induce them to rely on their misrepresentations and omissions.

406. Defendants acted intentionally, knowingly, and maliciously to violate Ohio's Deceptive Trade Practices Act and recklessly disregarded Plaintiff and Ohio Subclass members' rights.

407. Defendants' representations and omissions were material because they were likely to—and did—deceive Plaintiff and Ohio Subclass Members about the true nature of the products' privacy practices and the existence, nature, scope, and extent, of a human review pipeline, factors that would be important to a reasonable consumer in deciding whether to purchase the products and at what price.

408. Defendants acted intentionally, knowingly, and maliciously to violate Ohio's Deceptive Trade Practices Act and recklessly disregarded Plaintiff's and Ohio Subclass members' rights.

409. Plaintiff and Ohio Subclass Members would not have purchased the products, or would have paid less, had Defendants disclosed the true nature of the products' privacy practices and human review pipeline.

410. Defendants' above-described unfair and deceptive practices and acts were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury that these consumers could not reasonably avoid; this substantial injury outweighed any purported benefits to consumers or to competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Ohio Subclass

members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including:

a. payment of the purchase price and/or price premium;
b. loss of the benefit of their bargain; and
c. privacy and dignitary harms associated with exposure of intimate footage to human annotators.

411. Plaintiff and Ohio Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, actual damages, restitution, attorneys' fees, and any other relief that is just and proper.

**COUNT XXV**

**TENNESSEE CONSUMER PROTECTION ACT**

**(Tenn. Code Ann. §§ 47-18-104, *et seq.*)**

**(Brought by Plaintiff Christopher Taylor against Defendants Meta and Luxottica on behalf of the Tennessee Subclass)**

412. Plaintiff Christopher Taylor ("Plaintiff," for purposes of this Count), restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

413. Plaintiff brings this claim individually and on behalf of the Tennessee Subclass.

414. Defendants engaged in deceptive trade practices affecting the conduct of trade or commerce in violation Tenn. Code Ann. §§ 47-18-104(b), including:

a. Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have;
b. Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;
c. Advertising goods or services with intent not to sell them as advertised;

d. Representing that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve or which are prohibited by law; and

e. Representing that a guarantee or warranty confers or involves rights or remedies which it does not have or involve.

415. Defendants' deceptive trade practices include:

a. advertising and marketing the products as "designed for privacy, controlled by you," "built for your privacy," and similar statements conveying robust privacy protections;

b. representing that consumers' data would remain private and under their control when using the products; and

c. omitting, suppressing, concealing, and failing to disclose the material facts that: (1) intimate footage, including bathroom visits, sex, nudity, and financial information, would be transmitted to Meta's servers and viewed and annotated by human contractors overseas for in Meta's AI training pipeline, and (2) users who wished to make use of the products' core AI features could not opt out of the human review pipeline.

416. Defendants intended to mislead Plaintiff and Tennessee Subclass members and induce them to rely on their misrepresentations and omissions.

417. Defendants acted intentionally, knowingly, and maliciously to violate the Tennessee Consumer Protection Act and recklessly disregarded Plaintiff and Tennessee Subclass members' rights.

418. Defendants' representations and omissions were material because they were likely to—and did—deceive Plaintiff and Tennessee Subclass Members about the true nature of the products' privacy practices and the existence, nature, scope, and extent, of a human review pipeline, factors that would be important to a reasonable consumer in deciding whether to purchase the products and at what price.

419. Plaintiff and Tennessee Subclass Members would not have purchased the products, or would have paid less, had Defendants disclosed the true nature of the products' privacy practices and human review pipeline.

420. Defendants' above-described unfair and deceptive practices and acts were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury that these consumers could not reasonably avoid; this substantial injury outweighed any purported benefits to consumers or to competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Ohio Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including:

a. payment of the purchase price and/or price premium;
b. loss of the benefit of their bargain; and
c. privacy and dignitary harms associated with exposure of intimate footage to human annotators.

421. Plaintiff and Tennessee Subclass Members seek all relief available under the Tennessee Consumer Protection Act, including actual damages, treble damages where authorized, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT XXVI

## DECEPTIVE TRADE PRACTICES – CONSUMER PROTECTION ACT

**(Tex. Bus. & Com. Code §§ 17.41, *et seq.*)**

**(Brought by Plaintiff Ray Rodriguez against Defendants Meta and Luxottica on behalf of the Ohio Subclass)**

422. Plaintiff Ray Rodriguez ("Plaintiff," for purposes of this Count), restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

423. Plaintiff brings this claim individually and on behalf of the Texas Subclass.

424. Plaintiff and the Texas Subclass members are "consumers" as defined by Tex. Bus. & Com. Code § 17.45(4).

425. Defendants advertised, offered, or sold goods or services in Texas and engaged in trade or commerce directly or indirectly affecting the people of Texas as defined by Tex. Bus. & Com. Code § 17.45(6).

426. Defendants engaged in false, misleading, or deceptive acts and practices in violation of Tex. Bus. & Com. Code § 17.46(b), including:

a. Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have;
b. Representing that goods or services are of a particular standard, quality or grade, if they are of another; and
c. Advertising goods or services with intent not to sell them as advertised.

427. Defendants engaged in unconscionable actions or courses of conduct, in violation of Tex. Bus. & Com. Code Ann. § 17.50(a)(3). Defendants engaged in acts or practices that, to consumers' detriment, took advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree.

428. Defendants' false, misleading, deceptive, and unconscionable acts and practices include:

a. advertising and marketing the products as "designed for privacy, controlled by you," "built for your privacy," and similar statements conveying robust privacy protections;
b. representing that consumers' data would remain private and under their control when using the products; and
c. omitting, suppressing, concealing, and failing to disclose the material facts that: (1) intimate footage, including bathroom visits, sex, nudity, and financial information, would be transmitted to Meta's servers and viewed and annotated by human contractors overseas for in Meta's AI training

pipeline, and (2) users who wished to make use of the products' core AI features could not opt out of the human review pipeline.

429. Defendants' representations and omissions were material because they were likely to—and did—deceive Plaintiff and Texas Subclass Members about the true nature of the products' privacy practices and the existence, nature, scope, and extent, of a human review pipeline, factors that would be important to a reasonable consumer in deciding whether to purchase the products and at what price.

430. Plaintiff and Texas Subclass Members would not have purchased the products, or would have paid less, had Defendants disclosed the true nature of the products' privacy practices and human review pipeline.

431. Consumers, including Plaintiff and Texas Subclass Members, lacked knowledge about the products' true privacy and data-handling practices because that information was known exclusively to Defendants. Defendants alone knew that content captured by the products—including highly intimate footage from inside homes, bedrooms, and bathrooms, and financial information—would be transmitted to Meta's servers and exposed to human annotators overseas. Plaintiff and Texas Subclass Members also lacked the ability, experience, or capacity to evaluate the design and operation of Defendants' systems, to understand that human annotators would routinely view their intimate footage, or to fully protect their interests with regard to the data captured by the products. Plaintiff and Texas Subclass Members lack expertise in information-security and AI-training practices and do not have access to Defendants' systems to evaluate their privacy and security controls. Defendants took advantage of their superior knowledge, technical expertise, and exclusive access to the data-handling pipeline to conceal the products' true privacy risks and their inability or unwillingness to protect the confidentiality of Plaintiff's and Texas Subclass Members' data.

432. Defendants intended to take advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree, with reckless disregard for

the resulting unfairness. The unfairness resulting from Defendants' conduct is glaringly noticeable, flagrant, complete, and unmitigated: By purchasing products marketed as "designed for privacy, controlled by you," Plaintiff and Texas Subclass Members unknowingly exposed the most intimate aspects of their lives to review and annotation by strangers overseas and provided valuable training data for Meta's AI models without meaningful disclosure or consent. Defendants' unconscionable acts and practices transformed the products from privacy-protective devices into surveillance conduits and exposed Plaintiff and Texas Subclass Members to wholly unwarranted dignitary harm, emotional distress, and wholly unwarranted elevated risk of stalking, extortion, identity theft, and reputational injury. Plaintiff and Texas Subclass Members cannot mitigate this unfairness because they cannot reclaim or erase the intimate footage and associated data that Defendants have already captured, transmitted, exposed to human annotators, and used in their AI-training pipeline.

433. Defendants' above-described unfair and deceptive practices and acts were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury that these consumers could not reasonably avoid; this substantial injury outweighed any purported benefits to consumers or to competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Texas Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including:

a. payment of the purchase price and/or price premium;
b. loss of the benefit of their bargain; and
c. privacy and dignitary harms associated with exposure of intimate footage to human annotators.

434. Defendants' unconscionable and deceptive acts or practices were a producing cause of Plaintiff's and Texas Subclass members' injuries, ascertainable losses, economic damages, and non-economic damages, including their mental anguish.

435. Defendants' violations present a continuing risk to Plaintiff and Texas Subclass members as well as to the general public.

436. Plaintiff and the Texas Subclass seek all monetary and non-monetary relief allowed by law, including economic damages; damages for mental anguish; treble damages for each act committed intentionally or knowingly; restitution; court costs; reasonably and necessary attorneys' fees; injunctive relief; and any other relief which the court deems proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendants and that the Court grant the following:

A. For an Order certifying the Classes, and appointing Plaintiffs and their Counsel to represent the Classes;

B. For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiffs and Class Members;

C. For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

D. prohibiting Defendants from engaging in the wrongful and unlawful acts described herein; requiring Defendants to change their business practices to prevent or mitigate the risk of the consumer deception and violations of law outlined herein. This includes, for example, an order that immediately enjoin Defendants from continuing to market, advertise, distribute, and sell the products in the unlawful manner described; that require Defendants to engage in an affirmative advertising campaign to dispel the public misperception of the products resulting from Defendants' unlawful conduct; and/or that require Defendants to take all

further and just corrective action, consistent with applicable law and pursuant to only those causes of action so permitted;

E. For an award of damages, including actual, statutory, nominal, consequential, and punitive damages, as allowed by law in an amount to be determined;

F. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

G. For prejudgment interest on all amounts awarded; and

H. Such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury on all claims so triable.

Dated: March 13, 2026

Respectfully submitted,

_/s/ Megan E. Jones_
Megan E. Jones (SBN 296274)
mjones@hausfeld.com
**HAUSFELD LLP**
580 California St, Fl 12
San Francisco, CA 94104-1033
Telephone: (415) 744-1951
Facsimile: (415) 358-4980

Amanda V. Boltax*
John Thompson*
aboltax@hausfeld.com
jthompson@hausfeld.com
**HAUSFELD LLP**
1200 17th Street, N.W., Suite 600
Washington, DC 20036
Telephone: (202) 540-7200
Facsimile: (202) 540-7200

Steven M. Nathan (SBN 153250)
Zelly Rosa*
snathan@hausfeld.com
zrosa@hausfeld.com
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: (646) 357-110
Facsimile: (212) 202-4322

Helen I. Zeldes (SBN 220051)
*hzeldes@sshhzlaw.com*
Susan G. Taylor (SBN 190753)
*staylor@sshhzlaw.com*
**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES, LLP**
501 West Broadway, Suite 800
San Diego, California 92101
Telephone: (619) 400-4990

***Counsel for Plaintiffs***

****pro hac vice forthcoming***